## MARSHALL v. LOVELL.*

Circuit Court of Appeals, Eighth Circuit.
May 10, 1927.

No. 7592.

1. Contracts ⬤➞113(3)—Contract for secret profit to member of bondholders' committee to secure ratification of contract for purchase of property held illegal.

Contract between member of bondholders' committee and one negotiating for purchase of property from committee, whereby member was to receive a secret profit from purchaser in consideration of securing ratification of agreement, *held* illegal as contrary to sound public policy, in that member of committee was guilty of unfaithful conduct as trustee in profiting out of the transaction.

2. Contracts ⬤➞138(1)—Courts of equity will not interfere to grant relief to either party to illegal contract.

Where an illegal contract has been entered into, courts of equity will not interfere to grant relief to either party, but will leave parties where it finds them.

3. Contracts ⬤➞138(3)—Generally property sold or delivered under illegal contract cannot be recovered, where parties are in pari delicto.

Generally suit cannot be maintained to recover back property sold or delivered under an illegal contract, where the parties are in pari delicto.

*Rehearing denied August 23, 1927.

4. Contracts ⬤➞139—Equity, if parties to illegal contract are not in pari delicto, may aid one comparatively more innocent.

Where parties to illegal contract are both to some extent involved in illegality and affected with unlawful taint, but are not in pari delicto, court of equity may, in furtherance of justice and sound public policy, aid one who is comparatively the more innocent.

5. Contracts ⬤➞138(3)—Parties to contract for sharing profits of purchase of corporate property between director of seller and director of buyer were in pari delicto, precluding property recovery by either.

In action to recover certain property, or value, delivered in performance of illegal contract, whereby plaintiff, during negotiations for purchase of public utilities property, agreed with member of bondholders' committee for a secret profit, evidence relative to claimed coercion and duress *held* to show that parties in making contract were in pari delicto and that sound public policy did not demand recovery by plaintiff of property delivered pursuant to such illegal contract.

Appeal from the District Court of the United States for the District of Minnesota; John B. Sanborn, Judge.

Suit by Warner Marshall against Walter D. Lovell. Decree of dismissal (11 F.[2d] 632), and plaintiff appeals. Affirmed.

Franklin F. Phillips, Jr., of Boston, Mass. (Thomas McDermott and Denegre, McDermott & Stearns, all of St. Paul, Minn., on the brief), for appellant.

James D. Shearer, of Minneapolis, Minn. (L. B. Byard and Shearer, Byard & Trogner, all of Minneapolis, Minn., on the brief), for appellee.

Before STONE and KENYON, Circuit Judges, and POLLOCK, District Judge.

KENYON, Circuit Judge. This is a peculiar case. Appellant, Marshall, seeks to recover certain property, or its value, which he delivered to appellee in performance of a contract conceded by him to be illegal, and so found by the trial court. Briefly the circumstances are these:

Appellee was heavily interested as a bondholder in the Wenatchee Valley Gas & Electric Company, a corporation of the state of Washington (hereinafter designated as the Wenatchee Company). The affairs of that company becoming critical, a bondholders' committee was formed, consisting of appellee, Lovell, one John B. Fassett, and W. S. Taylor. The title to all the bonds of the Wenatchee Company was placed in this committee in trust, with full power to do all necessary things to protect the interests of the bondholders. Lovell possessed some 233

bonds of the par value of $1,000 each, and controlled 86 others owned by relatives. He was the dominating personality of the bondholders' committee. Proceedings were commenced for the foreclosure of the trust deed securing the bonds, and it was deemed for the best interests of the bondholders that the property be disposed of if a reasonable price could be secured. The Washington Coast Utilities Company (hereinafter designated as the Washington Company) had been organized and promoted by appellant, Marshall. At the time of the transactions here in question, one Nims was' president thereof. Its common stock was owned by Marshall & Co. of Boston, which company was dominated by appellant. Negotiations were entered into for the purchase of the properties of the Wenatchee Company by the Washington Company, resulting in a tentative arrangement between Mr. Nims, Mr. Marshall, and Mr. Lovell for the sale of the Wenatchee properties. The arrangement contemplated the issue of bonds by the Washington Company, and also preferred stock. Marshall was to buy the properties from the receiver of the Wenatchee Company and transfer them to the Washington Company. He was to receive as the purchase price thereof and as his compensation $225,000 of the common stock of the Washington Company, $350,000 of its preferred stock, and $760,000 of its bonds. The bondholders of the Wenatchee Company were to receive for each $1,000 bond held by them $500 of preferred stock and a $500 bond of the Washington Company. Marshall was to pay all the receiver's certificates and all prior liens in cash. The net result to Marshall of this transaction would be to leave him as his compensation $225,000 of common stock, $23,000 of preferred stock, and approximately $183,000 of bonds of the Washington Company, or a total of about $431,000 par value securities. While these securities were not worth par, they had a substantial value. The tentative arrangement contemplated that the bondholders' committee should bid in the properties at the foreclosure sale and transfer them to Marshall.

After continuing negotiations, a memorandum was drawn up on the 9th day of April, 1921, signed by Marshall, Nims, and two of the bondholders' committee, viz. Messrs. Taylor and Fassett, reciting that the arrangement was approved by the committee, and that it should be submitted to a meeting of the bondholders of the company for ratification. Lovell did not sign, and, after Nims, Fassett, and Taylor left the meeting place, Marshall and Lovell had a conversation in which it is claimed by Marshall that Lovell told him, in substance, that the deal would not go through unless he (Lovell) received substantially $200,000 of the securities Marshall was obtaining, that he had the power to defeat the ratification of the arrangement, and that he would do so unless this arrangement was made. Marshall expressed his surprise and indignation in rather emphatic language, but agreed "to think it over." Marshall left for Boston, which was his home, and apparently discussed the matter with Nims, and with his counsel. The agreement with the bondholders' committee was dated April 14, 1921, and was made in accordance with the arrangements previously discussed. At the same time, though dated later (May 16, 1921) the agreement which is the basis of this controversy between Lovell and Marshall was drawn up, which provided that Lovell should deliver to Marshall, after the sale was closed, $43,000 of the 6 per cent. cumulative preferred stock of the Washington Company, Marshall agreeing to deliver to Lovell $127,000 6 per cent. first mortgage bonds of the Washington Company, and $50,000 of its 6 per cent. notes, the notes to be dated the day the title to the Wenatchee property passed to Marshall; further, to pay Lovell $5,000 in cash on that day; also to purchase from him $100,000 face value of the Washington Company first mortgage 6 per cent. bonds within a year at a certain price. Under the terms of said written contract, Lovell was to use his efforts to bring about the ratification of the proposed bondholders' agreement. He was to give advice in engineering matters, and represent Marshall in negotiations with banks and others. Certain other things were provided by the written contract, which need not be referred to. Both contracts were guaranteed by the Washington Company. The agreement between Marshall and the bondholders' committee was ratified by the bondholders on August 4, 1921, at which meeting Lovell voted a majority of the bonds. Had he voted against the proposed agreement, it could not have been ratified. The properties were transferred to Marshall and by him to the Washington Company.

After the entire matter was completed, Marshall in December, 1921, carried out his agreement with Lovell, the making of which was unknown to the other members of the bondholders' committee, and delivered to him the securities and cash as provided in the contract, and Lovell delivered to Marshall $43,000 of preferred stock of the Washington Company. Subsequently there was correspondence between Marshall and Lovell with-

out any question being raised as to the transaction until February, 1923, at which time Marshall demanded the return of what Lovell had received from him under the contract, or its equivalent in value, offering to offset the preferred stock which he had received from Lovell. This was refused; Lovell taking the position that the securities which he had received from Marshall under his private agreement belonged to the bondholders of the Wenatchee Company, and he delivered to a trust company to hold for the bondholders the amount of bonds representing their proportionate share, retaining the amount which represented his proportion as a bondholder. Lovell pleads that it was always his intention to turn over these securities to the bondholders. The trial court found that he had no such intention. The same were turned over to the trust company after Lovell had consulted his attorney and found he could not hold these securities as his own. Lovell had put in some time without compensation in his attempts to dispose of the property, and he claimed these securities were his compensation. The court found that Lovell did make the exaction from Marshall at the time and under the circumstances as asserted by Marshall. It also found that the rights of the bondholders to retain the bonds were superior to any right Marshall might have to recover them. The court's conclusion in effect was a holding that public policy did not require Lovell to give back to Marshall what he had received from him; nor that there was such disparity of dereliction as would permit Marshall to recover in equity the properties he had transferred to Lovell. The court found that the net result of the entire transaction was that Lovell made a much better bargain for the bondholders than either he or Marshall suspected or intended, and entered a decree dismissing plaintiff's bill of complaint.

[1] The contract between Marshall and Lovell was illegal. Counsel for appellant in the trial court very frankly conceded this, and the same concession is made here. In the trial court he insisted that the only important question in the case was that of duress, and whether or not Marshall was coerced into making the contract, stating to the court at the close of appellant's evidence: "We admit that there was no physical duress whatever. We will admit that, when his mind was made up, Mr. Marshall signed freely, and always treated the contract as legal, and never questioned its legality until the year 1923, and that he has always treated Mr. Lovell pleasantly from the time he entered into the contract with him." Lovell was one

of the trustees of the bondholders. Fidelity to his trust was the most important element of such trusteeship. The contract put him in a position where his personal interest conflicted with his duty to the bondholders. By trying to enrich himself he betrayed his trust, secretly securing a benefit in a transaction where he was supposed to be acting for the interest of the bondholders. He was guilty of unfaithful conduct as a trustee in profiting out of the transaction. Such a contract is illegal as contrary to sound public policy, because it tends to weaken a trustee's fidelity to duty. The court so found, and no other finding could stand under the law. United States v. Carter, 217 U. S. 286, 30 S. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594; Wardell v. Railroad Co., 103 U. S. 651, 26 L. Ed. 509; City of Findlay v. Pertz et al. (C. C. A.) 66 F. 427, 29 L. R. A. 188; Torpey v. Murray, 93 Minn. 482, 101 N. W. 609; Lum v. Clark et al., 56 Minn. 278, 57 N. W. 662; 39 Cyc. 296.

[2] Appellant concedes the general rule that, where an illegal contract has been entered into, courts of equity will not interfere to grant relief to either party, but will leave the parties where it finds them, but urges the well-established exception thereto, that a party may have relief by the undoing of the illegal agreement, although fully performed, if he is not in pari delicto, and if the granting of relief will be in furtherance of justice and sound public policy, urging that the contract here is "intrinsically unequal," and the position of appellant less illegal and blameworthy than that of appellee, and that coercion of appellant is apparent as a matter of legal inference.

[3, 4] It is the general rule that a suit cannot be maintained to recover back property sold or delivered under an illegal contract where the parties are in pari delicto. However, courts may under such circumstances interfere from motives of public policy. The law is stated in 2 Pomeroy's Equity Jurisprudence (4th Ed.) § 941, as follows: "Even where the contracting parties are in pari delicto, the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him." This court has discussed rather fully, in Stewart v. Wright, 147 F. 321, the question of granting relief where the parties may be in delicto, but not in pari delicto. On that subject we quote also from Pomeroy's Equity Jurisprudence (4th Ed.) § 942: "Lastly, when the contract is illegal, so that both parties are to some extent involved in the ille-

19 F.(2d)—48

gality, in some degree affected with the unlawful taint, but are not in pari delicto—that is, both have not, with the same knowledge, willingness, and wrongful intent, engaged in the transaction, or the undertakings of each are not equally blameworthy—a court of equity may, in furtherance of justice and of a sound public policy, aid the one who is comparatively the more innocent, and may grant him full affirmative relief, by canceling an executory contract, by setting aside an executed contract, conveyance, or transfer, by recovering back money paid or property delivered. * * * . Such an inequality of condition exists so that relief may be given to the more innocent party, in two distinct classes of cases: (1) It exists where the contract is intrinsically illegal, and is of such a nature that the undertakings or stipulations of each, if considered by themselves alone, would show the parties equally in fault, but there are collateral and incidental circumstances attending the transaction, and affecting the relations of the two parties, which render one of them comparatively free from fault. Such circumstances are imposition, oppression, duress, threats, undue influence, taking advantage of necessities or of weakness, and the like, as a means of inducing the party to enter into the agreement, or of procuring him to execute and perform it after it had been voluntarily entered into." National Bank & Loan Co. v. Petrie, 189 U. S. 423, 23 S. Ct. 512, 47 L. Ed. 879; In re Sylvester's Estate, 195 Iowa, 1329, 192 N. W. 442, 30 A. L. R. 180; Williston on Contracts, § 1789.

The appellant claims that, while he was in delicto, he was not in pari delicto with appellee, because he was coerced and entered into the contract by reason of duress.

What is this claimed coercion or duress? Is it sufficiently shown to bring appellant under the exception to the general rule?

The bondholders' committee, consisting of appellee as one of its members, had made with relation to the transaction a memorandum of agreement, which appellee had not signed. This agreement had to be submitted to the bondholders for approval. After two of the members, Taylor and Fassett, had left the room, Lovell refused to sign, and demanded an understanding from Marshall as to the turning over to him of $200,000 of securities on his personal account. Marshall replied to this: "Well that is a hell of a note. * * * That is the most outrageous thing I have ever heard; * * * that is an outrageous piece of business. * * * What are you going to do if I do not pay it?" Lovell responded: "Well, you want to

remember that I own or control enough bonds to defeat the ratification of this contract." When Lovell asked him what he was going to do about it, Marshall said, "I am going to think it over." Lovell testified to a different version of the matter, but the trial court found Marshall's version correct. This is the evidence on which the theory of duress is based. Marshall did not at the time of the alleged threat agree to the proposition of Lovell. He took time to consider it. He instructed Nims to get Lovell down as low as he could on his terms, and then left for Boston. It was several days before the two contracts were finished. Marshall showed them to his attorney, who approved of them. Marshall then signed them. Later he met Lovell and another member of the committee at Philadelphia. Certain interlineations were made in the contract with the bondholders. It was then signed by Lovell and Taylor and sent on for Mr. Fassett's signature. The contract between Marshall and Lovell, while bearing a later date, was really signed at approximately the same time. It is not claimed that there was any disparity in the position, experience, physical prowess, or mental acumen between Marshall and Lovell. After the making of this secret contract in 1921 until the time a demand was made on Lovell in 1923 to return the property, friendly letters were exchanged between them. Marshall made Lovell a social visit at Minneapolis, and there was nothing to show he deemed himself wronged by Lovell. At the time of the threat by Lovell to defeat the contract, Marshall had no property that Lovell was attempting to take away from him. He was not called on to act immediately. The threat did affect profits which he might realize if the contract was carried out, and the result of acceding to Lovell's demand would be a division of the profits with Lovell. Marshall waited several days after Lovell's proposition before he signed the contracts. It was approximately four months before the bondholders' contract was ratified, and some eight months until Marshall turned over to Lovell the securities provided for by the private contract. It would seem under these circumstances that the making of the contract, the turning over of the securities, and the carrying out of the contract were the voluntary acts of Marshall, and that the alleged threat did not prevent the free exercise of his will, understanding and desire. Certainly there was no such pressure brought upon Marshall as to compel him to act against his will. It was not a case either of trying to secure his property from one having control or possession thereof. Of course, he

was loath to give up any of his contemplated profits, but he had at the time of the so-called coercive threat no contract for the purchase of the properties. Lovell might have changed his mind and prevented the making of the contract, even had there been no talk of dividing the profits. Marshall had time to think it all over; he did so, and then deliberately decided it would be better to part with some of his profits than to run the risk of Lovell's defeating the contract or bidding in the property at the foreclosure sale. If a highwayman at the point of a revolver should demand from his victim his money and securities, and the victim should say, "I will think it over for a few months and then determine what I will do," and at the expiration of a few months should write the highwayman that he had decided to turn over the money and securities to him and did so, it could scarcely be claimed that the victim was acting under coercion. The only coercion affecting Marshall's action seems to be the thought in his mind that if he did not assist in corrupting Lovell he might not secure the contract and therefore would lose some contemplated profits.

In Radich v. Hutchins, 95 U. S. 210, 213 (24 L. Ed. 409), the court said: "To constitute the coercion or duress which will be regarded as sufficient to make a payment involuntary, * * * there must be some actual or threatened exercise of power possessed, or believed to be possessed, by the party exacting or receiving the payment over the person or property of another, from which the latter has no other means of immediate relief than by making the payment. As stated by the Court of Appeals of Maryland, the doctrine established by the authorities is, that 'a payment is not to be regarded as compulsory, unless made to emancipate the person or property from an actual and existing duress imposed upon it by the party to whom the money is paid.' "

Legal duress and coercion is not shown but rather negatived by this record. Silliman v. United States, 101 U. S. 465, 25 L. Ed. 987; Little v. Bowers, 134 U. S. 547, 10 S. Ct. 620, 33 L. Ed. 1016; Lonergan v. Buford, 148 U. S. 581, 13 S. Ct. 684, 37 L. Ed. 569; Chesebrough v. United States, 192 U. S. 253, 24 S. Ct. 262, 48 L. Ed. 432; United States v. New York ·& Cuba Mail Steamship Co., 200 U. S. 488, 26 S. Ct. 327, 50 L. Ed. 569; Connolly v. Bouck et al. (C. C. A.) 174 F. 312; International Harvester Co. v. Voboril (C. C. A.) 187 F. 973; Meyer v. Guardian Trust Co. (C. C. A.) 296 F. 789, 35 A. L. R. 856; 13 C. J. p. 402; 9 R. C. L. p. 716, § 7.

[5] We are satisfied that the evidence shows the parties in making the contract were in pari delicto, and that no sound public policy demands a recovery by Marshall under the circumstances disclosed. The position of both of these parties is utterly indefensible, vicious, and pernicious. Lovell violated his duty as a trustee; Marshall assisted him so to do. Lovell used his position as trustee to enrich himself; Marshall assisted him in order likewise to profit. Lovell sold his influence; Marshall bought it.

This brings us to the well-established maxim applicable to the situation here presented, "ex dolo malo non oritur actio." Its application, exclusive of every other question, is fatal to appellant's case. In Pullman's Palace-Car Co. v. Central Transp. Co., 171 U. S. 138, 150, 18 S. Ct. 808, 813 (43 L. Ed. 108), the court said: "The principle is not new; but, on the contrary, it has been frequently announced, commencing in cases considerably over a hundred years old. It was said by Lord Mansfield, in Holman v. Johnson, 1 Cowper, 341, decided in 1775, that 'the objection that a contract is immoral or illegal as between the plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: Ex dolo malo non oritur actio. No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act.' " In Levy v. Kansas City, Kan. (C. C. A.) 168 F. 524, 525, 22 L. R. A. (N. S.) 862, this court said: " 'Ex dolo malo non oritur actio' is a maxim which lies at the foundation of a general rule of public policy, the rule that the courts will not sustain an action which arises out of the moral turpitude of the plaintiff or out of his violation of a general law enacted to carry into effect the public policy of the state or nation."

The fact that the action is one to recover back money paid under an illegal contract and not an action to enforce the contract makes no difference. In Levy v. Kansas City, supra, this court said: "But the maintenance of actions to recover moneys or property lost, or damages sustained, through transactions or contracts wherein the plaintiffs were guilty of moral turpitude, or of the violation of a general law passed to effectuate a public policy, is prohibited by this rule, as well as the maintenance of actions upon contracts of that nature."

Suppose Marshall had not delivered the money and securities to Lovell, and Lovell had brought an action against him to recover them. Surely none would contend that the door of equity would be opened to him. Lovell's act involved moral turpitude. It was a breach of trust, an indefensible and detestable act, a violation of sound public policy. It is difficult to draw a line as to moral turpitude between the corrupted and the corruptionist; between the bribed and the briber; between one who betrays a trust and one who induces him so to do. While possibly Marshall did not owe the same duty to the fiduciaries, he owed the same duty to sound public policy, as did Lovell. We are not called on to measure a difference in the moral turpitude of Marshall and Lovell. Both are in the same mire. One who assists in such a scheme as Lovell proposed to Marshall does so at his peril.

A court of equity is here asked to assist a party in recovering what he has paid to influence a trustee to violate his trust. It should decline so to do. Marshall's own wrong and moral turpitude, in assisting Lovell to violate his trust, closed the doors of equity against him just as they would be closed to Lovell were he seeking to enforce his contract. Appellant is not in equity with clean hands. Coppell v. Hall, 7 Wall. (74 U. S.) 542, 19 L. Ed. 244; Thomas v. City of Richmond, 12 Wall. 349, 20 L. Ed. 453; Trist v. Child, 88 U. S. 441, 22 L. Ed. 623; Irwin v. Williar, 110 U. S. 499, 4 S. Ct. 160, 28 L. Ed. 225; Harriman v. Northern Securities Co., 197 U. S. 244, 295, 25 S. Ct. 493, 49 L. Ed. 739.

In Stewart et al. v. Wright (C. C. A.) 147 F. 321, 338, this court sustained recovery by a party in delicto under most peculiar circumstances. The majority opinion goes to an extreme length in that case, but the case is really sui generis, and evidently the court thought public policy demanded that a gang of swindlers should not escape and hide behind the maxim, "ex dolo malo non oritur actio." It is to be observed that the court there found the parties were not in equal wrong. It is also to be noted that there is an able and vigorous dissent in that case by Judge Sanborn, in which the leading cases on the subject are reviewed. In Abbe v. Marr, 14 Cal. 210, 212, the Supreme Court of California, with reference to a case where plaintiff asserted his own turpitude, said: "No court of justice can listen to such a case. When the plaintiff asserts his own turpitude in this way, he sends his case out of court. If, in attempting, by way of reprisal or otherwise, to swindle another, he becomes the

victim of his own arts, it may become a question in morals or in honor which party is the more culpable; courts of law entertain no discussion on the subject, but terminate the controversy by shutting their doors in the face of the intruder." See, also, McMullen v. Hoffman, 174 U. S. 639, 669, 19 S. Ct. 839, 43 L. Ed. 1117.

No case has been cited, or in our opinion can be, where under facts similar to those here presented a party has been permitted to recover back the property paid in an arrangement to corrupt a trustee. Neither party in this case is entitled to consideration from a court of equity. They should be left exactly where they are found. Both having assisted in making the bed in which they now find themselves, they should be content to lie quietly therein, and not disturb others.

The decree of the trial court is affirmed.