UNITED STATES v. BUCKNER et al.
No. 166.

Circuit Court of Appeals, Second Circuit.
Jan. 8, 1940.

---

Irving Spieler, John S. Leonard, and Neilson Olcott, all of New York City (Moses Polakoff and Samuel Mezansky, both of New York City, of counsel), for defendants-appellants.

George C. Norton, John B. Wheeler, and Neilson Olcott, all of New York City, and Fred C. Fisher, of Akron, Ohio, for appellant Felipe Buencamino.

William Power Maloney, Asst. U. S. Atty., of New York City (John T. Cahill, U. S. Atty., of New York City, on the brief), for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

William P. Buckner, Jr., and William J. Gillespie were convicted of using the mails to defraud. 18 U.S.C.A. § 338. They, together with Felipe Buencamino, were also convicted of conspiring to use the mails to defraud. 18 U.S.C.A. § 88. On their appeals from these judgments they have assigned the usual errors: they attack the sufficiency of the indictment and of the proof, the rulings on evidence, the charge, and the trial conduct of the prosecuting attorney. And they assert further that no indictable offense was either charged or proved against them.

The charges grow out of the activities of a bondholders' protective committee, headed by Buckner and Gillespie, for bonds of the Philippine Railway Company. They attempted to secure payment or redemption of the issue from the government of the Philippine Islands, where Buencamino was a member of the Assembly and a political leader. The general background, and, indeed, much of the testimony, at least as to acts and events, was undisputed; at any rate, there was evidence from which the jury might infer the following facts:

Bonds of the Philippine Railway Company in the amount of $8,549,000 had been marketed in this country and abroad thirty years ago with the active assistance of the United States and Philippine governments. The insular government guaranteed the payment of interest until maturity, July 1, 1937. Success never attended the enterprise, and as the date of maturity approached it became apparent that payment of the principal would be defaulted. Bankers' Trust Company, trustee under the mortgage indenture, called a meeting of bondholders for February 26, 1937. The meeting was of a familiar type: after acrimonious discussion a committee was at length elected. The defendants Buckner and Gillespie had attended the meeting on behalf of investment houses with which they were associated; together they represented just over 250 bonds of the 8,500 outstanding, and of which over 1,800 were participating. Nevertheless, Buckner and Gillespie were both elected members of the committee. Subsequently the committee designated Buckner its chairman, and Gillespie its vice-chairman, by a vote of three to two, after Buckner and Gillespie had met and persuaded the committee member Walden so to cast his decisive vote.

The public character of the original flotation of the bonds and the active encouragement lent to the enterprise by the Washington and Manila governments made the prospects favorable for some sort of legislation by which the public treasuries might come to the assistance of the bondholders. It was to this end that the committee directed its efforts. A law firm of high standing was retained as counsel, and ways and means were discussed for financing committee expenses, bound to be heavier than usual because of the contemplated lobbying activities. Members of the committee could not agree as to the restrictions under which a bank account was

to be opened, and at least one member of the committee, Winkler, was persuaded by Buckner and Gillespie to sign a resolution opening an account only after insertion of a condition that all drafts be countersigned by counsel. This condition was then blotted out of the resolution without Winkler's knowledge, and the account was opened with Bank of The Manhattan Company by Buckner and Gillespie in the name of the committee, their joint signatures to be sufficient for all payments from it. Letters signed by Buckner were then mailed to the bondholders holding $10,000 or more of bonds, requesting donations for expenses. Though the solicitations were written on the committee letterhead, no committee meeting had ever approved their emission. The two members of the committee who had originally opposed the selection of Buckner and Gillespie as its officers, together with the counsel, resigned at early stages of this history—one member within a month of its organization, because of his dislike of what was going on, and the other, Winkler, and the counsel, soon after the solicitations and immediately as a consequence of the ignoring of their objections thereto.

The first letter of solicitation was dated July 2, 1937. During July and August some $7,000 was received from bondholders. Buckner and Gillespie made frequent trips to Washington, and in the normal way secured the attentions of a few members of Congress. Occasionally acquaintances of the Broadway night club area were brought to the Capitol, presumably to assist in entertaining the political luminaries upon whom the committee was working. These efforts were crowned with some success, for a senator introduced a resolution providing for an investigation by the Attorney General into the Government's moral obligation to alleviate the plight of the bondholders. Committee funds were used not only to finance these legislative expeditions, but also to pay for local entertainment enjoyed by Buckner and Gillespie alone. Numerous committee checks were introduced in evidence, endorsed by hotels and night club proprietors; several of those present at the frequent summer evening gatherings testified that none of the events which there transpired had anything to do with Philippine Railway Bonds.

By October, Buckner had planned to fly to the Philippines with $5,000 borrowed on the credit of the committee. Before he left he agreed to furnish a speculator, Breen, with inside information as soon as a favorable redemption agreement was reached in Manila. He and the speculator were to divide whatever profits could be made by trading in the bonds. Gillespie remained in New York, ready to receive messages from Buckner and offer information to other traders, again in exchange for a share of the profits.

In Manila, Buckner met the defendant Senator Buencamino, a powerful figure in island politics. Buencamino agreed to lend his assistance to redemption legislation, in return for a promise of $50,000, which the prosecution insists was a bribe, but which is defended as legitimate counsel fees and expenses. The prosecution also attempted to prove that Buencamino knew of Buckner's prospective market operations, and was to share in the profits which Buckner would receive for furnishing tips as to the possibilities for redemption of the bonds.

When Buckner returned to New York he found that his trading arrangements had never come to fruition. There was no money left, and Buencamino demanded payment before proceeding. Together with Gillespie and a man named Turner, Buckner peddled his proposition around the financial district, offering inside information in return for temporary financing and a share of the speculation profits. Almost immediately the market in the bonds jumped from 11¾ to 30½, but collapsed again when the president of the Philippine National Bank gave a newspaper interview denying the rumored redemption. The other members of the committee, including new members as well as new counsel, were exceedingly disturbed by this flurry and a subsequent investigation by the Securities and Exchange Commission. After several meetings they compelled Buckner to send out a report, dated April 5, 1938, to all bondholders on their progress to that time, and then, over the opposition of Buckner and Gillespie, voted to dissolve, so that a new committee might be selected by the bondholders. No new committee was ever formed, and Buckner and Gillespie continued to hold themselves forth as chairman and vice-chairman respectively.

Rebuffed in local financial quarters, Buckner and Gillespie sought backing in Hollywood and London. The Hollywood adventure, in which movie stars were approached through a man named Hyde, contributed little except to add to the glamour

and publicity attendant upon the subsequent trial. In London they had better luck. A London financial house, after negotiations on both sides of the ocean, agreed to accumulate two million dollars' worth of the bonds as soon as it could be assured that the redemption legislation was reasonably certain of enactment. Profits. were to be split with Buckner and Gillespie. To furnish the London house with the necessary assurance, Buckner tried to lure Buencamino from Manila to London. Buencamino held out for a payment of $50,000 before sailing, remained untempted by $5,000 borrowed at Niagara Falls and deposited in Montreal to his credit, and finally refused to come at all. The London house withdrew, and Buckner, returning to New York, was arrested as he stepped off the ship.

The Grand Jury indicted Buckner, Gillespie, Buencamino, Turner, and Hyde. On their trial, Turner and Hyde were found not guilty by the jury; Buckner and Gillespie were found guilty on all counts, seven for misuse of the mails and the eighth for conspiracy; while Buencamino was found guilty on the eighth conspiracy count, and not guilty on the fifth count, the only other count upon which he was tried. All the defendants convicted were sentenced to imprisonment and fined on the conspiracy charge. Buckner and Gillespie were given prison sentences on each of the first six counts, with suspended sentences and probation on the seventh count. All the prison sentences ran concurrently, so that conviction on one count would sustain these sentences.

The defendants assert that this evidence shows at most only dissipation of committee funds for improvident expenses and perhaps bribery in the Philippines, but no mail fraud in New York. The prosecution claims, however, to have proven a scheme to defraud bondholders by bond dealings made profitable by the concealment of information as to the possibility of favorable legislation by the Philippine government, together with an accessory scheme to obtain funds from the bondholders nominally for legitimate committee expenses, but actually for the personal use of the committee officers. As we shall point out, we think the proof was adequate to sustain the convictions, except as to two of the seven counts for misuse of the mails.

■ 1. *The sufficiency of the indictment and the proof.* Defendants first attack the indictment for the alleged vagueness of the charges of using the mails to defraud. They claim that these charges fail to specify the precise character of each fraud and the particular manner in which it was committed. But the indictment sets forth the various fraudulent practices with sufficient particularity, and each of the first seven counts restricts the preliminary allegations to a single identified use of the mails. True, there are some vague and meaningless sentences in the first part of the indictment stating in a general way that defendants' activities were not "in the best interests" of the bondholders. These, however, are surplusage and may be ignored so long as the rest of the indictment is sufficient. Compare United States v. Brown, 2 Cir., 79 F.2d 321, certiorari denied 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 462; United States v. Goldsmith, 2 Cir., 108 F.2d 917.

■ Defendants' main objections to the indictment really go to the substance of the charges themselves and the ·sufficiency of the proof to support convictions on each count. If a conviction on a given count is to stand, it is not enough that there was evidence of a scheme to defraud. It must also be shown that the mails were used as part of the fraudulent scheme, and as to each letter relied upon, that the particular letter was not sent out until after a scheme to defraud had been born. Hass v. United States, 8 Cir., 93 F.2d 427.

The first seven counts in the indictment are each based on an identified letter sent through the mails. Counts one and six concern solicitation letters signed by Buckner, sent to bondholders on or about July 7 and 8, 1937, respectively. Counts two, three, four, and seven are based upon letters requesting donations to the committee or acknowledging their receipt, on or about September 29, October 1, August 3, and October 1, 1937, respectively. Count five refers to the letter reporting the progress of the committee, sent out to all bondholders on April 5, 1938, after Buckner's return from Manila. Count eight is the conspiracy charge.

■ We think the proof is insufficient as to counts one and six. At the time, early in July, 1937, when these first solicitation letters were mailed, no fraud appears to have been committed. The first committee deposit was made on July 10, the first withdrawal on July 12, 1937. The petty night club misappropriations did not occur until

later in July; the major scheme to take secret speculation profits at the bondholders' expense was not shown to have then been formulated. Nor is there any unequivocal evidence of a then existing intent to misappropriate the funds solicited. True, there is proof of the desire of Buckner and Gillespie to direct and control the committee, of their refusal to follow advice as to the solicitation of funds for expenses, and even of the tampering with the resolution preventing withdrawals of funds from the bank without the countersignature of their counsel. But as to the latter it appeared that their counsel wished to avoid this responsibility, and the evidence does not prove that the resolution was altered in order that the funds might be misused. Subsequent acts, too, may often support an inference of prior intent, but we do not think the evidence sufficient to permit the jury to do so here. It does not seem a proper inference that, at the inception of negotiations involving millions, a budding financier, whatever his aspirations as a playboy, would have solicited money from bondholders with a preconceived intention to misappropriate the funds in the petty dissipations disclosed at the trial. As to the more serious frauds involving market tips and the sharing of secret profits, it is quite possible, on the evidence submitted, that Buckner did not turn to this method of doing business until the legitimate sources of securing moneys for committee expenses had been tapped dry. Compare Hass v. United States, supra; Beck v. United States, 8 Cir., 33 F.2d 107, 111.

■ The second, third, fourth, fifth, and seventh counts stand upon a different footing. The earliest of these is based on a letter of August 3, 1937; by that time Buckner and Gillespie were already engaged in squandering much of the money that had been received up to then. They were fraudulently converting these trust funds to their own use, and at the same time they were using the mails to correspond with bondholders, acknowledging receipt of additional donations, obtained under the false pretense that they were to be expended solely for committee purposes. An intent to misappropriate at this time could clearly have been inferred. Perhaps it was a petty sort of intent, but petty also was the fraud.

Moreover, the jury could reasonably have concluded that the larger secret profit scheme had been formulated by this time, and certainly by September. The callous attitude of Buckner and Gillespie to their trust was already evident; the intricacy of the details of the fraudulent tipster plan Buckner expounded to the speculator Breen in October points to a long period of preparation. And evidence of the existence of the tipster project was abundant at the time specified in the fifth count, which related to the report letter sent by the committee to bondholders on April 5, 1938. We do not understand that there is any claim based on a failure to prove intent in relation to the eighth or conspiracy count; at any rate, a finding of the requisite intent here was well within the province of the jury.

Buckner and Gillespie also deny the sufficiency of the proof of any scheme to defraud. They admit that the minor misappropriations showed negligence and incompetence, but deny their fraudulent character. They contend that the various agreements to furnish secret information and share speculative profits deprived no one of money or property, and were not schemes to defraud within the meaning of the mail fraud statute.

■ Neither of these arguments possesses merit. The statute prohibits any scheme or artifice to defraud, and the word "defraud" must be construed broadly. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709. The elements of fraud developed in civil cases are applicable in prosecutions under the mail fraud laws. Foshay v. United States, 8 Cir., 68 F.2d 205, 210, 211, certiorari denied 291 U.S. 674, 54 S.Ct. 531, 78 L.Ed. 1063. Defendants, as protective committee members, were fiduciaries. Marshall v. Lovell, 8 Cir., 19 F.2d 751, 755. Intentionally converting trust funds to the personal use of the trustees is a patent fraud on the cestuis from whom the funds were solicited. Campbell v. United States, 9 Cir., 12 F.2d 873. Using a fiduciary position as a protective committee member to obtain secret profits based upon inside information is not only a breach of trust, but an active fraud on the bondholders. Marshall v. Lovell, supra; Matter of Republic Gas Corp., Debtor, No. 60281,[1] D.C.S.D.N.Y., June 10, 1936; see In re Paramount Pub-

---

[1] No opinion for publication.

lix Corp., D.C.S.D.N.Y., 12 F.Supp. 823, 828, affirmed 2 Cir., 83 F.2d 1015; Michoud v. Girod, 4 How. 503, 45 U.S. 503, 553, 554, 11 L.Ed. 1076. The first wrong cannot be defended as negligence, nor can the second be excused on the unsupported assertion that it is common practice for committeemen to trade, for their own account, in the securities represented. Both frauds are schemes to defraud within the purport of the mail fraud statute. Campbell v. United States, supra.

It is to be noted that, unlike the ordinary protective committee, which purports to represent only those holders who have made a deposit of their bonds, this committee asked for no deposit, but assumed to represent the bondholders generally and the committee reported to them generally in its letter of April 5, 1938. Compare Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853; Yourd, Trading in Securities, 38 Mich.L.Rev. 133, 143 (1939).

■ 2. *Rulings on evidence*. The defendant Buckner attacks two rulings made when he was on the witness stand under cross-examination by the Assistant United States Attorney. On direct examination, Buckner had testified that, prior to leaving for Manila, he resigned from the New York Bar. On cross-examination, the Attorney inquired into the circumstances surrounding this resignation. Objections were at first overruled; but this line of questioning was dropped after a conference at the bench and before anything prejudicial occurred. Later, however, over objection, the Attorney was permitted to place in evidence an affidavit signed by Buckner and filed with the Appellate Division of the New York Supreme Court, in which Buckner stated that his resignation was tendered because the "deponent realizes that in the event a disciplinary proceeding were instituted against him charging professional misconduct based upon transactions in which he has participated he could not successfully defend the same, and accordingly he tenders said resignation and consent."

We do not regard this procedure as improper. It would have been permissible, as bearing on the credibility of the witness, to ask him whether he had been disbarred. People v. Dorthy, 156 N.Y. 237, 50 N.E. 800. Questions regarding resignation under fire, together with an admission of inability to make a successful defense against charges of professional misconduct, imply very much the same sort of immoral acts as does disbarment, and should be similarly admissible to affect credibility. United States v. Sager, 2 Cir., 49 F.2d 725, is not controlling. There the questions held improper concerned resignation from the post of Assistant to the Attorney General. A withdrawal from office carries with it no such implication of improper conduct as does resignation from the bar. There, too, the cross-examination probed at length into the circumstances surrounding Sager's resignation from office. A similar line of questioning below was halted.

■ Nor did the trial judge err in allowing Buckner's affidavit to go into evidence as affecting his credibility. Since Buckner's credibility was not a collateral issue, his signed affidavit, filed with the Appellate Division, might be regarded as an informal judicial admission. Richardson on Evidence, 2d Ed., § 340; 2 Wigmore on Evidence, 2d Ed., §§ 1058, 1066. Buckner had already testified on direct examination that he had resigned; the cross-examiner was entitled to go into the details of the resignation. Merely stating that he had resigned was for Buckner a half-truth, and the Assistant United States Attorney could introduce Buckner's prior contradictory statements, so long as they were to some extent at variance with his present testimony. The affidavit may be viewed as a prior contradictory statement, admissible as bearing on the credibility of Buckner's present testimony. Matter of Roge v. Valentine, 280 N.Y. 268, 276, 277, 20 N.E.2d 751. Dickinson v. Dustin, 21 Mich. 561, does not persuade to the contrary.

■ The second ruling concerns Buckner's refusal to testify before the Securities and Exchange Commission. At the trial Buckner declared on cross-examination that there was nothing "wrong" with the tipster profit-sharing scheme he had arranged with the speculator Breen. The prosecutor was permitted to bring out that at the S. E. C. hearing Buckner had been questioned about this same scheme, and had refused to answer, claiming his privilege. Buckner was then asked at the trial to explain why he claimed his privilege before the S. E. C., if there was nothing wrong with the Breen deal. This was not improper. In Raffel v. United States, 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054, defendant did not take the stand in the first trial, in which the jury disagreed. At

the second trial, defendant testified in his own behalf, and on cross-examination, it was held proper to question him on his refusal to testify at the prior trial. The court said, "We can discern nothing in the policy of the law against self-incrimination which would require the extension of immunity to any trial, or to any tribunal, other than that in which the defendant preserves it by refusing to testify." 271 U.S. at page 499, 46 S.Ct. at page 568, 70 L.Ed. 1054. The defendant Buckner voluntarily took the stand; he consequently opened himself to cross-examination on all the facts in issue, just as any other witness does. The Breen deal was certainly in issue; Buckner's prior refusal to testify cast serious doubt upon his statement at the trial that the arrangement involved nothing "wrong." Under the Raffel case, we see no reason why his refusal to testify may not now be used against him.

■ 3. *The charge.* The defendants assign numerous objections to the charge of the court. But none of these objections were made at the trial. At the close of his address to the jury, the court said: "I wish to say to counsel that a great many requests to charge were submitted to me. I have not had a chance to examine them in great detail because of the shortness of time. If you believe that I have not covered and discussed them, or if there are any that you wish to call to my attention, you may do it now." Counsel for Buckner made four requests; three were granted and the fourth is inconsequential. Counsel for Buckner then said, "I think that is all." Buencamino's lawyer read several requests; all were charged substantially as desired. The court asked: "Is there anything further, gentlemen?" Counsel for Buckner replied, "No, Your Honor." No other requests were made by any one; no exceptions were taken. The defendants cannot now complain of any errors in the charge, for the reasons set forth at length in United States v. Manton et al., 2 Cir., 107 F.2d 834.

It should be added that the attack now made upon the charge represents in the main the conception of the law which the defendants have pressed upon us here and which we have rejected.

■ 4. *The trial conduct of the Assistant United States Attorney.* All defendants lay great stress upon the misconduct of the Assistant United States Attorney. They complain of the spectacular and prejudicial manner in which he managed the trial as a whole, and also attack particular instances of misbehavior in examination of witnesses and in colloquies with opposing counsel. Even from the printed record we can see the vigor with which the prosecutor pressed the case, vigor which at times went beyond the canons of decorum and dignity which an officer of the United States should observe. The prosecutor was not averse to indulging his talent for spectacle: chorus girls and movie stars were paraded to the stand to prove only minor portions of the Government's case. Theatrical demonstrations, however diverting to the spectators and jury, have no place in a United States court room. Nor was the intemperance of several attacks made upon defendants and their counsel in keeping with the Supreme Court's reminder that the prosecutor is to regard himself as "the servant of the law." Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. We cannot approve such conduct. Our task, however, is to consider it not from isolated outbursts, but as a whole, and to determine whether it deprived the defendants of a fair trial, cautioned by the suggestion of the Berger case that reversal for misconduct is less clearly indicated where the proof is strong and convincing. Strong and convincing it is here; the disregard of the bondholders' interests by the indicted committeemen was beyond dispute, and their illegal and fraudulent activity apparent. Indeed, the evidence was such as to justify vigorous prosecution and summation. The court in its charge, and repeatedly during the trial, cautioned the jury to ignore the remarks of counsel. And the spectacular nature of the evidence was, after all, due to the defendants' own crimes. Had they not provided the opportunity, the prosecutor could not have presented so exciting a case to the jury.

It is only fair to say also that the prosecutor was not the only sinner against the standards of trial decorum. Many of the incidents now stressed were caused by the actions of defendants' counsel; indeed, at times the court warned that a continuance of their tactics was sure to get them "in trouble by inviting a reply." And, after such an exchange, when counsel protested and asked for a mistrial, the court was justified in doing no more than admonish the Government's attorney specifically and all counsel generally. True, im-

proprieties of defendants' counsel do not of themselves justify impropriety by the prosecution, but they do call for and often make necessary immediate opposing tactics. "The attempt to turn this trial of men whose guilt was abundantly proved into a trial of government's counsel, though a not infrequent expedient of defendants who have no other recourse, ought not, in our opinion, to succeed." United States v. Dubrin, 2 Cir., 93 F.2d 499, 506, certiorari denied 303 U.S. 646, 58 S.Ct. 644, 82 L.Ed. 1107.

Two matters call for specific reference. One was the prosecutor's claimed attempts to inject into his questions on cross-examination evidence not otherwise admitted; the other was his call for the production of documents by the defendants during the trial. As to the first, the prosecutor went far in several instances, but we do not think the circumstances demand a declaration of mistrial. The line between proper cross-examination, inquiring of a witness how far he will persist in his statements in the light of other expected testimony, and questions which seem to set forth such testimony as facts, becomes narrow and a considerable discretion in determining it should be left to the trial judge. Perhaps the chief example here was the question asked in cross-examination of Buckner: "Now, * * *, if Mr. Turner said in the statement signed and sworn to that [he saw a certain letter], would you say that was correct?" No such statement of Turner was introduced. Turner did not take the stand. The court allowed this question, pointing out, however, that there was no proof of the fact of Turner's statement; it then declined to permit further questions along this line. A similar question concerning a statement by Hyde was excluded, though Hyde did testify later as to the existence of such a letter, as did other witnesses. Whether the failure of Turner to take the stand led the prosecutor not to offer the statement referred to (perhaps admissible as an admission of one of the conspirators, 2 Wigmore on Evidence, 2d Ed., § 1079), whether, indeed, there was such a statement, we do not know. At any rate, we think the court committed no error in its choice of the point at which to terminate this questioning.

The other problem arises also in Buckner's cross-examination. One assignment of error refers to a demand by the prosecutor to produce stenographic bills, but this demand was not pressed. Another is more important. Here the prosecutor called upon Buckner's counsel to produce a memorandum from Buencamino and then further letters from the same source. Buencamino's counsel denied there were other letters; the Attorney stated that he saw such a letter among the papers of Buckner's counsel; the latter denied knowledge of any letter, but offered to search for it; it was discovered and introduced into evidence without objection. It was not important in itself, though the prosecutor did capitalize on the denial of its existence by Buencamino's counsel. The defendants rely on the well-known case of McKnight v. United States, 6 Cir., 115 F. 972, as showing that this procedure was a violation of the privilege of an accused against self-incrimination. This case, in the extent to which it apparently goes, has been criticized by Professor Wigmore as "purely fallacious and wholly unsound" and as exercising a "baleful spell" over other courts. 4 Wigmore on Evidence, 2d Ed., § 2268; cf. 29 Harv.L. Rev. 211. It seems, however, to have been generally followed, at least to the extent that such a demand to produce is improper unless there has been waiver by the accused. The cases are examined and the present law stated in Powell v. Commonwealth, 167 Va. 558, 189 S.E. 433, 110 A. L.R. 90, and in the annotation thereto at pages 101-119 of 110 A.L.R.

But the privilege of self-incrimination can be waived by the accused; and where he has taken the stand he has waived the privilege of silence and may be called upon to produce documents relating to his testimony. Paschen v. United States, 7 Cir., 70 F.2d 491, 501; State v. Price, 173 Wash. 108, 21 P.2d 1038; State v. Schopmeyer, 207 Ind. 538, 194 N.E. 144. This covers the case of Buckner, and the last case cited holds that a co-defendant who has not taken the stand cannot complain. Cf. De Camp v. United States, 56 App.D. C. 119, 10 F.2d 984, 986. Further, this court has held that an accused must make objection or exception or else it may be concluded that there was nothing affirmatively incriminatory or prejudicial in the demand. Kritcher v. United States, 2 Cir., 17 F.2d 704; cf. United States v. Rosenstein, 2 Cir., 34 F.2d 630, certiorari denied 280 U.S. 581, 50 S.Ct. 33, 74 L.Ed. 631; Bain v. United States, 6 Cir., 262 F. 664,

certiorari denied 252 U.S. 586, 40 S.Ct. 396, 64 L.Ed. 729. Hence error was not shown.

5. *The proof against Buencamino.* The defendant Buencamino contends that the counts against him should have been dismissed because of failure to connect him with the conspiracy. · He was convicted of conspiracy only. One of the many letters to and from Buencamino introduced into evidence, that of July 30, 1938, from him to Buckner, was alone of sufficiently sinister import to justify the jury in concluding that Buencamino was connected with the scheme to defraud the bondholders. That letter was in response to Buckner's attempts to lure Buencamino to London. It reads in part: "Agreeable to your request I am sending ·you this air mail letter with reference to your desire that I go to London to carry out our preliminary understandings. * * * I want to warn you that I will be unable to carry out our understanding unless at the time you desire me to proceed either to New York or to London you pay $50,000.-00 here in Manila. * * * My friends here, whose cooperation I need to push through the program * * * will not do anything on a contingent basis. They feel that they have done enough in the past to show their willingness to cooperate and have an idea that you must have made a profit during the last flurry in New York. * * *" There could have been only one reason for going to London: to assure the London house which was going to speculate in bonds on secret tips furnished by Buckner and split the profits with all the conspirators, that the redemption legislation would be passed. Buencamino must have known of the deal with the London house; that deal was the essence of the scheme to defraud; the quoted portions of the letter indicate that Buencamino knew of and assisted in the conspiracy. At any event, the jury was amply justified in so concluding. Other evidence, both oral and written, tended to the same conclusion. And when once a connection was shown between Buencamino and the conspiracy, evidence of the earlier activities of Buckner and Gillespie during the spring and summer of 1937, tending to prove the origin and existence of the conspiracy, was admissible against Buencamino. United States v. Bob et al., 2 Cir., 106 F.2d 37, certiorari denied 308 U.S. ——, 60 S.Ct. 115, 84 L.Ed. ——.

The judgments herein are affirmed, except those against Buckner and Gillespie on the first and sixth counts, which are reversed.