## GLOVER v. UNITED STATES.

### No. 9921.

Circuit Court of Appeals, Fifth Circuit.

Jan. 23, 1942.

Rehearing Denied March 23, 1942.

HUTCHESON, Circuit Judge, dissenting.

W. Paul Carpenter and A. Walton Nall, both of Atlanta, Ga., and Roy V. Harris, of Augusta, Ga., for appellant.

Lawrence S. Camp, U. S. Atty., and J. Ellis Mundy and James T. Manning, Asst. U. S. Attys., all of Atlanta, Ga., for appellee.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

HOLMES, Circuit Judge.

The appellant, J. G. Glover, was convicted and sentenced on eighteen counts of an indictment charging the use of the mails to defraud. The principal question for decision involves the sufficiency of the evidence to make out a case for the jury.

During the years 1937 to 1940, as supervisor of state forces for the highway board of Georgia, appellant's duties were to supervise and manage the state convicts who were used to build and repair the highways of Georgia, and to locate, construct, maintain, and manage the prison camps erected near various road projects throughout the state. The indictment charged that Glover, in the performance of his duties, devised or intended to devise a scheme to defraud the highway department, the state, and its taxpayers of large sums of money by purchasing, in his own name, lands adjacent to

or near the camp sites selected by him, and by having erected thereon, by the use of state labor and money, elaborate and expensive houses and improvements ostensibly for the use of the camp wardens but actually for his own personal use and benefit; that he manipulated the deals in a manner designed to deprive the state of property lawfully belonging to it, and concealed his illicit dealings from the state highway board; and that he caused the mails to be used in execution of his said fraudulent scheme.

Many of the salient facts are not in dispute. Appellant admits that he occupied a position of trust and confidence; that his duties and responsibilities were those alleged in the indictment; that he located each of the three camp sites in question, and purchased land in his own name adjoining the camps or near to them; that houses and other improvements were erected upon his property by the use of state funds, equipment, materials, and labor; that two of the three houses were more elaborate in design and more expensive in construction than the average of the houses built for wardens; and that the disbursements of state funds in payment of the obligations incurred in the construction of the improvements were made, almost without exception, by checks transmitted through the mails in accordance with established practice.

While much of the remaining evidence is conflicting, and although appellant's explanation of the admitted facts might, if believed, exonerate him completely, there is sufficient credible evidence in the record to justify the submission of the case to the jury and to support the verdict. The two expensive houses were built on appellant's property in Dade and Dawson Counties. James Finley, who was employed by the state highway board as a special investigator, testified that he made a tour of inspection, in the summer of 1940, to six of the convict camps operated by the State of Georgia, including that in Dawson County. At three of these camps a house had been built by the state for the warden, and the house in Dawson County erected on appellant's land was, Finley testified, much more expensive and elaborate than the other two.

B. D. Purcell, the Principal of Schools in East Point, Fulton County, Georgia, was likewise employed as an investigator by the Board. He visited four other camps, including that in Dade County at which the warden's house was located on appellant's property. His testimony disclosed that houses were built and furnished to the warden at two of these camps, and that the house erected on appellant's property was considerably more elaborate and valuable than the other.

The house in Dawson County occupied an elevated site connected with the highway by a ramp built by labor from the camp. It was a six-room house with a screened sleeping porch, a front porch, a rock and cement foundation, concrete steps and basement, a paved driveway, and a garage with a concrete floor. The entire six acres owned by appellant was inclosed by a wire fence constructed and paid for by the state. The house was completed in May, 1940. Mr. Patten, a member of the state highway board, testified that the Board expected to complete the Dawson County projects by December 31, 1942, two years and seven months subsequent to the completion of the house. The warden who occupied this house was a bachelor.

The house in Dade County was erected on a bluff above a new scenic highway more than a mile and a half from the camp. It, too, was a six-room house with a composition roof and a cemented rock foundation. The walls were storm-sheeted, the sleeping porch was screened, the basement had a concrete floor, and the steps were of cemented rock. This house was completed on July 1, 1940, approximately three years prior to the date the state highway board expected the Dade County projects to be completed. Though both of the wardens testified that it was agreed between them and appellant that these houses were to be removable at the will of the state highway board, there was nothing in writing to evidence the agreement, the members of the Board were not informed that the houses were being constructed upon appellant's property, the design of their construction was predominantly for permanency rather than removability, and the salvage therefrom upon removal admittedly would be of little value. Other permanent improvements of an immovable nature were also made upon the properties.

The facts surrounding the construction of the third house are somewhat different. In this instance the land was bought with state funds in appellant's name under express instructions from the appellant. We consider it unnecessary to set forth the evidence adduced by the govern-

ment in greater detail. In our opinion it is sufficient to support the verdict of the jury.

■■ This is true whether or not, under the circumstances of each transaction, the State at all times had the right to remove the houses at will. Whether appellant's statements in conversation with the wardens, to the effect that the houses were removable by the Board, would be considered a binding agreement between Glover and the Board which would create an easement in favor of the Board under the real property law of Georgia, is wholly immaterial. The scheme to defraud is not required to be reasonable, practical, or successful, and the damage calculated to result therefrom may be great or small.[1] The statute, 18 U.S.C.A. § 338, was violated if the mails were caused to be used in furtherance of a scheme, either devised or intended to be devised, to defraud or to obtain property by deceptive means.[2] The facts show that appellant's property was materially enhanced in value, and that state funds were wrongfully diverted into personal channels. That this result was brought about by the intentional scheming of the defendant, as charged in the indictment, was an inference that was reasonably deduced from the evidence.

■ The indictment charged that the procedure followed by the appellant in building these houses violated the established plan, rule, and practice of the state highway department. This allegation was surplusage, and the failure of the proof to substantiate it had no effect upon the validity of the conviction.[3] The denial of appellant's motion for a directed verdict of not guilty was proper.

■ Other assignments of error involve the refusal of the court below to give several requested instructions to the jury relating to the effect, under Georgia law, of verbal agreements for the removal of realty from the land of another. As we have indicated, the refusal of the court to give these instructions was not error, for the reason that these instructions were directed toward the success of the scheme, not to its existence. Whether or not the property laws of Georgia would have prevented the successful culmination of the scheme, the formulation and attempted execution thereof by the use of the mails, with the intent to defraud, constituted a commission of every essential step in the crime charged.[4]

■ The lower court's denial of the motion for a new trial, on the ground of newly discovered evidence, was not an abuse of discretion. If newly discovered, this evidence was useful only to bolster other evidence which, if resolved against the defendant by the jury, could not have been prejudicial to him. Since it was immaterial, except in so far as it may have been indicative of the intent of the accused, whether the State actually retained the right to remove these houses, it is also immaterial that it, in fact, has been permitted to remove them. The record presents no reversible error, and the judgment appealed from is affirmed.

HUTCHESON, Circuit Judge (dissenting).

With deference, the undisputed evidence not only does not support, it completely negatives the statement of the majority opinion, "The facts show that appellant's property was materially enhanced in value and that state funds were wrongfully diverted to personal channels." Since however, what is in question here, is not the success or failure of a fraudulent scheme but whether one was devised and the mails were used in connection with it, and whether defendant has been fairly tried and fairly convicted, no useful purpose will be served in setting out here the evidence on this point. It will be sufficient to show, as I think I can, in discussing the grounds on which the majority opinion for affirmance is rested, that it was immaterial "whether or not under the circumstances of each transaction, the state at all times had the right to remove the house at will", that this was greatly material, indeed of the essence of the charge, and that under the

[1] Le More v. United States, 5 Cir., 253 F. 887; Wine v. United States, 8 Cir., 260 F. 911; Grant v. United States, 6 Cir., 268 F. 443; Cowl v. United States, 8 Cir., 35 F.2d 794.

[2] Calnay v. United States, 9 Cir., 1 F.2d 926; Fournier v. United States, 7 Cir., 58 F.2d 3; Mazurosky v. United States,

9 Cir., 100 F.2d 958; United States v. Buckner, 2 Cir., 108 F.2d 921.

[3] Hall v. United States, 168 U.S. 632, 18 S.Ct. 237, 42 L.Ed. 607; Leche v. United States, 5 Cir., 118 F.2d 246.

[4] Schauble v. United States, 8 Cir., 40 F.2d 363; Hill v. United States, 5 Cir., 73 F.2d 223; United States v. Zalewski, D.C., 29 F.Supp. 755.

facts, the houses did not and never could have become the property of the defendant. Because, I think, this holding is greatly conducive to unclear thinking on, and therefore to the use of, the Mail Fraud Statute as a catchall, like the old common law conspiracies were used in England, for convicting persons deemed undesirable on proof not of a definitely formulated plan which was calculated, if carried out, to defraud, but upon proof of their desires or imaginings, I dissent, and will set down as clearly and as briefly as I can, my reasons for dissenting.

The gist of the scheme to defraud, as the indictment stated it, was that defendant "would build houses more elaborate in design and construction than was necessary for wardens' houses, and that such valuable houses would not and should not be constructed and indeed were not constructed upon lands leased from individuals as was the plan, rule and practice of the highway board but would be and should be and indeed were built upon defendant's own land to which he had title individually in fee simple, and that said houses and dwellings having become attached to the realty of the defendant, would and should be, and in fact did become, the sole property of the defendant." To make out a case against defendant under this charge, the United States was required to prove that the houses were placed upon lands of the defendant under conditions making them the property of defendant. If the evidence showed this, a case was made out. If it did not, defendant was entitled to an instructed verdict, on the ground that, under the law of Georgia, the circumstances under which the houses were placed on defendant's property made them at all times, re-movable at the will of the state, and prevented their becoming a part of the realty and defendant from obtaining any benefit from them. These circumstances, established by the undisputed testimony of defendant and the two wardens who caused the houses to be built and lived in them, are that they were placed on defendant's property for the use of the state and under an agreement and understanding that they were subject to removal at the state's will.

Defendant moved for a directed verdict and in the alternative, for special charges submitting his defense, that if the houses were placed on his property, under an agreement that they were removable, such placing was not and could not be fraud.[1] The District Judge refused these requests and the majority affirmed their refusal on the ground that it was wholly immaterial; "whether or not under the circumstances of each transaction, the state at all times had the right to remove the house at will"; and, "whether appellant's statement in conversation with the wardens to the effect that the houses were removable by the Board would be considered a binding agreement between Glover and the Board which would create an easement in favor of the Board under the real property law of Georgia".

In so holding, the court erroneously held, in effect, that it was not necessary for the state to prove the existence of the scheme it had alleged, or indeed any scheme calculated to defraud; it was sufficient if the jury believed not that defendant had, as charged, devised a scheme to place the houses on his land under such conditions that he would acquire the title thereto, but had, with an evil hope and wish not exhibited in the scheme he charged but en-

---

[1] "There is evidence in this case to the effect that the defendant on trial, who was Supervisor of State Convict Forces of the State of Georgia, gave to wardens in charge of certain convict camps, authority to place buildings for the State Highway Department on lands belonging to the defendant and the right to remove said buildings at any time the State Highway Department saw fit.

"I charge you that if the defendant gave the wardens such permission and the wardens acting for the State Highway Department of Georgia entered upon lands of the defendant and constructed buildings thereon, and in so doing the State Highway Department incurred expense that the State Highway Department would have the right to use said land for the purpose of placing the buildings thereon and the right to remove said buildings at any time they saw fit."

"If the defendant gave to the wardens of the State Highway Department, at the convict camps located in the Counties of Millnes, Dawson and Dade, permission to use the lands of defendant for the purpose of placing thereon buildings and gave to the State Highway Board of Georgia the right to remove said buildings at any time they saw fit, through the wardens themselves, the permission given to the wardens would have the same effect as if the permission was given directly to the State Highway Board of Georgia."

tertained in his heart that the state might forget or fail to take the houses off, permitted the wardens to build more expensive houses on his land than had been built on the land of others from whom permission to build houses had been obtained.

This will not at all do. There are no common law crimes against the United States, United States v. Eaton, 144 U.S. 677, 12 S.Ct. 764, 36 .L.Ed. 591; Norton v. United States, 9 Cir., 92 F.2d 753, 756. "Regard is always to be had to the familiar rule that one may not be punished for crime against the United States unless the facts shown plainly and unmistakenly constitute an offense within the meaning of an act of Congress." Donnelley v. United States, 276 U.S. 505, 48 S.Ct. 400, 401, 72 L.Ed. 676. Under the statute [2] in question, the indictment is fatally defective if it charges the offense in general language without disclosing the particulars of the scheme or artifice. It must plead facts disclosing the scheme with such certainty as to clearly inform the defendant of the charge made against him and the nature of the evidence to be produced in proof of its execution, and these facts must be proved. United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 31 L.Ed. 516; Etheredge v. United States, 5 Cir., 186 F. 434; United States v. Goldman, D.C., 207 F. 1002; Id., 6 Cir., 220 F. 57. The particulars of the scheme are matters of substance, must be set forth with sufficient certainty to acquaint the defendant with the charges against him and must be proved substantially as alleged. Savage v. United States, 10 Cir., 270 F. 14; Gardner v. United States, 8 Cir., 230 F. 575. While therefore, it is true that mailing is an essential element in the offense, it is equally true that a fraudulent scheme is an essential element in the crime of using the mails to defraud, Aiken v. United States, 4 Cir., 108 F.2d 182, and that the failure to allege a scheme to defraud and to prove it substantially as alleged, is fatal to the prosecution. As used in the statute, "The words 'to defraud' * * * primarily mean to cheat, that they usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching." Fasulo v. United States, 272 U.S. 620, 47 S.Ct. 200, 201, 71 L.Ed. 443. This is not to say of course that for a conviction a scheme to defraud must be successful. The contrary has been too clearly and too often held. Hill v. United States,

4 Cir., 73 F.2d 223; Norton v. United States, 9 Cir., 92 F.2d 753, 755.

The majority opinion is therefore correct in stating that a scheme to defraud is not required to be reasonable, practical, or successful. It is to say though, that unless there is a scheme, that is, acts planned which if carried out, would defraud, there is no scheme to defraud. "Intent to defraud is an essential element of the offense. The person devising the fraudulent scheme must intend in some manner to delude the person upon whom the scheme is to be practiced. There can be no intent to deceive where it is known to the party making the representations that no deception can result." Norton v. United States, supra, 92 F.2d at page 755.

Here, the charge was that defendant, relying upon a settled practice of the Board to place the houses on the properties under conditions which would attach them to the realty and to leave them on the properties when the wardens were through with their use, schemed to place houses on his own lands under circumstances which would make them a part of the realty and therefore his property. The uncontradicted proof that there was no such practice on the part of the Board and particularly that the houses were placed on the defendant's property under circumstances which, under the law of Georgia, prevented their becoming attached to the realty or in any way becoming his, completely negatived the charge and entitled the defendant to an instructed verdict of acquittal. But if it be contended that though both the defendant and the wardens who caused the houses to be built and lived in them swore that they were placed on the lands with the understanding that they were to be removed, the jury might have disbelieved this evidence, certainly the defendant was entitled to have this specific defense submitted to the jury under the charges he requested. Notwithstanding defendant's explanation that not he but the wardens determined the kind of houses to be built, the fact that the two houses placed on defendant's land were better constructed and cost some more than the warden's houses placed on lands of others, would, but for the proof establishing that under no conditions would the houses become his, tend to support the charge that he had planned to get the houses by placing them on his land. Because of this testimony, as to the cost of the

---

[2] 18 U.S.C.A. § 338.

houses, if appellant was not entitled to a directed verdict, it was of the greatest importance to his defense to have the question whether they were placed on his property under an agreement for their removal, submitted as he requested.

The function of reviewing courts is of course to affirm where a case has been fairly tried and no substantial error has been shown, but its function to reverse, when the contrary is made to appear, is as compelling.[3] Of the opinion that that is the case here, I dissent from the affirmance of the judgment.

On Rehearing.

PER CURIAM.

In this case appellant was granted time to file a brief in support of the application for rehearing. In the mistaken belief that the time for filing the brief had expired the motion for rehearing was inadvertently overruled. That order is now recalled.

The brief having been filed in time, it has been considered by the Court and the motion for a rehearing is denied.

---

[3] Grimsley v. United States, 5 Cir., 50 F.2d 509, 511.