Joe H. SCHNEIDER, Trustee in Bankruptcy of the Estate of Morgan Insurance Agency, Inc., Bankrupt, Plaintiff,

v.

Dutch O'NEAL and George A. Toney, doing business as Eton Insurance Agency, Defendants.

Civ. No. 2689.

United States District Court
E. D. Arkansas, W. D.

Sept. 28, 1956.

**122**

D. D. Panich, Little Rock, Ark., for plaintiff.

Barber, Henry & Thurman, Little Rock, Ark., for defendants.

TRIMBLE, Chief Judge.

This suit was brought by Joe H. Schneider, Trustee in Bankruptcy of the estate of Morgan Insurance Agency, Inc., against Dutch O'Neal and George A. Toney, doing business as Eton Insurance Agency. Complaint was filed November 2, 1953.

The suit challenges the legality of a series of transactions carried on between the bankrupt and the defendants in which the defendants allegedly received from the bankrupt payments of commissions earned by the bankrupt totalling the sum of $43,379.31. It was alleged that this total sum of more than $43,000 was paid to the defendants within one year next preceding the filing of the petition in bankruptcy and that of this total amount the sum of $9,617.62 was paid by the bankrupt to the defendants within four months preceding the filing of the bankruptcy petition.

There are two grounds for recovery set up in the complaint; first, that the payments were made by the bankrupt to the defendants at a time when the defendants had reasonable cause to believe that the bankrupt was insolvent and that there was no present fair consideration for any payments made; and second, that the payments were made in violation of the insurance law of the State of Arkansas.

Defendants filed answer on November 19, 1953, admitting the bankruptcy of Morgan Insurance Agency, Inc., and the appointment and qualification of the plaintiff Trustee in Bankruptcy. The defendants admitted that Dutch O'Neal and George A. Toney were partners doing business as Eton Insurance Agency.

The defendants denied that the suit was brought under the provisions of Sections 60, 67 and 70 of the Bankruptcy Act, 11 U.S.C.A. §§ 96, 107, 110, and they further denied that the suit was brought under the provisions of Sections 66–326, 68–1302, and 68–1304 of the 1947 Arkansas Statutes, and they stated affirmatively that the statutes and provisions referred to are not applicable to the suit filed. The answer denied specifically the allegations of the complaint relating to any unlawful agreement and the acceptance of illegal commissions on insurance covering automo-

biles sold by Dutch O'Neal Motors, Inc., or any other party. It further specifically denied the payment to plaintiffs of the sums set forth in the complaint and further that plaintiffs did anything to hinder, delay, or defraud the creditors of the bankrupt.

The answer of defendants denied that they knew or had reasonable cause to believe that the bankrupt was insolvent, and further that the bankrupt was indebted to plaintiffs in any amount and that the indebtedness constituted an antecedent debt and that there was no present fair consideration for any of the payments referred to, and further that there was at any time the relationship of debtor and creditor between the defendants and the bankrupt.

At the pre-trial conference held on March 16, 1955, plaintiff announced that reliance would also be had upon Sections 66–301 and 66–321 of the 1947 Arkansas Statutes. Pre-trial briefs were filed by all parties, the plaintiff's being filed on March 29, 1955 and the defendants' on April 26, 1955. Plaintiff in its pre-trial brief set forth somewhat at length what its contentions would be with respect to the insolvency of the bankrupt during its business negotiations with the defendants and the payments made to the Eton Insurance Agency of commissions on insurance written by the Morgan Insurance Agency. Plaintiff's pre-trial brief detailed the operations of the Eton Insurance Agency, one of the partners, George A. Toney, and W. S. Morgan, Jr., manager of the Morgan Insurance Agency. The brief further discussed the applicability of Sections 66–258, 66–301, 66–321, and 66–326 of the Arkansas Statutes of 1947.

Defendants' pre-trial brief set forth its theory of the case and submitted that the plaintiff's contentions should be rejected because Toney was duly licensed to write physical damage insurance, and further that the Arkansas law regulating the licensing of insurance solicitors and agents excludes automobile dealers or automobile finance companies or their employees that write fire, theft, physical damage, comprehensive and collision insurance on motor vehicles only, and further that since the entire transaction occurred between two licensed insurance agents, the payments made to Eton Insurance Agency was by the brokerage arrangement permissible under the Arkansas Statutes.

At the beginning of the trial of the case on June 18, 1956, counsel for the plaintiff announced in open court that plaintiff did not rely for a recovery in this case upon any of the provisions of the Bankruptcy Act, but solely upon the illegality of the transactions under the insurance statutes of the State of Arkansas, above referred to. At the conclusion of the trial, the defendant orally made a motion for summary judgment on the ground that if the payments of the commissions by Morgan Insurance Agency to Eton Insurance Agency, Inc., were illegal, the payments cannot be recovered by the Trustee in Bankruptcy because the bankrupt was *in pari delicto* with the Eton Insurance Agency.

There appear to be no disputed questions of fact in the case, but there are vital questions of law.

One question is whether or not the payments made by the bankrupt to the Eton Insurance Agency, Inc., were prohibited by the Arkansas Insurance Laws. The answer to the question depends upon the construction of Sections 66–301, 66–304, 66–321 and 66–328 of the Arkansas Statutes, 1947. I shall attempt to analyze these statutes and determine whether or not the transactions involved herein were in violation thereof.

Section 66–301 provides that each insurance company shall certify to the Commissioner the name or names of agents representing it and that no such agent shall transact business until he has procured from the Commissioner a certificate showing that the company has complied with the requirements of the Act, and that the person named in the certificate has been duly appointed its agent.

Section 66–321 is the statute which prohibits the payment of commissions to

unlicensed persons. It provides that no insurance corporation or agent thereof shall pay any commission or other compensation to any person for service in obtaining insurance, unless such person shall have procured from the Insurance Commissioner a certificate of authority to act as an agent *of such company.*

It is contended that the payments made by Morgan to Eton were in violation of this statute. The plaintiff claims that the result of the agreement between Morgan and Eton was that it was the understanding that these policies of insurance on automobiles financed by the General Contract Purchase Corporation were to be written by the American Fidelity Insurance Company, which was not represented by either of the partners constituting the Eton Insurance Agency. Plaintiff says that the agreement was formed for the specific purpose of violating this provision of the law, that the agreement was wholly void and that the payments made by Morgan to Eton may be recovered by the plaintiff.

Section 66–326 is the statute prohibiting rebates and certain other payments. It provides that no insurance company or agent shall pay, allow, or give directly or indirectly any rebate, discount, abatement, credit, or reduction of the premium named. It further provides that no insured named in a policy, nor any employee of such insured, shall knowingly receive any such rebate, discount or reduction of premium. This section further provides that nothing therein shall be construed as prohibiting the payment of commission or other compensation to duly licensed agents, brokers or solicitors or as prohibiting any insurer from allowing or returning to its participating policyholders dividends, savings or unabsorbed premium deposits.

It is insisted by the defendants that the last sentence of Section 66–326 serves to legalize the payment of commissions to one not an agent of the company in which the insurance was written. If this argument on the part of the defendant is correct, then Section 66–326 practically repeals the provisions of the first sentence of Section 66–321. The first of these sections has been in the law of this state since 1921. The latter section was passed in 1947. It is argued that this provision of Section 66–326 applies only to agents having authority to write the insurance involved; in other words, that if Eton had been a duly licensed agent of the American Fidelity Insurance Company, it would have been lawful for it to receive a commission or other compensation even though the insurance was written by some other agent; that Eton was not authorized to represent this insurance company and it would, therefore, not fall within the category of "duly licensed agents, brokers or solicitors". It was further argued that this provision of the statute was not designed to legalize the payment of a commission to the agent of any other company than the one from whom he received the commission; that otherwise, it would serve to constitute only a cloak to enable a violator of Section 66–321 to do the things that are condemned by the statute.

The defendants say that Section 66–304 permits the payment of a commission on the theory that the transaction was a brokerage arrangement made expressly permissible under the Arkansas Statutes. This conclusion of the defendant is arrived at by means of a negative provision of the statute wherein it states that no such commission shall be paid to "any person, firm, agent, or corporation not duly authorized and licensed by the Auditor (Commissioner) as agent for any fire insurance company, accident or employers' liability insurance company, * * * ."

This Section 66–304 was enacted in 1901 and amended by the Act of May 11, 1905. It does not affirmatively state that a commission may be paid by one company to an agent for another company. If it could be implied that it was so intended, the subsequent Act of 1921, Section 66–321, prohibiting the payment of a commission to any person for service in obtaining insurance, unless such person shall have procured a certificate to

act as an agent for such company, would have repealed that implied provision.

It was suggested by the defendants in their trial brief that Section 66–328 of the Arkansas Statutes, Act 58 of 1949, § 1, licensing and regulating agents and solicitors of insurance companies expressly excludes from its application automobile dealers or automobile finance companies or their employees that write fire, theft or physical damage and collision insurance on motor vehicles only. This does not mean that such agents are exempted or excluded from the application of other insurance laws of the State of Arkansas, but only that they are excused from the requirements of an examination. They cannot operate without a license and they are not excluded from other provisions of the insurance laws of the State of Arkansas.

The court's attention has been called to Sections 66–312 and 66–313 of the Arkansas Statutes and it is argued that these provisions of the law legalize the payment of commissions by Morgan to Eton. The first of these sections states that "Any commission received by a resident agent may be shared with another resident agent or with a licensed non-resident insurance broker". It is interesting to note that this section of the statute is followed by a similar, or what might be called an enlarging provision in the next section of the act. This provision is in part "nor may any such resident agent or agency allow or pay to any agent *not regularly licensed* or to any unlicensed non-resident insurance broker any portion of any commission which he received or is entitled to receive." When the latter provision is read in the light of the 1921 Statute, Section 66–321, it is seen that it does not serve to legalize the payments (not sharing of commissions), by Morgan to Eton, and if it had been the purpose of the Legislature in the passage of this Act to repeal the provision of the 1921 Statute prohibiting a person not licensed by an insurance company from receiving commissions on premiums paid to that company, it would doubtless have been so expressly provided. An examination of the entire Act, No. 175 of the Acts of 1943, of which said Sections 66–312 and 66–313 are a part will disclose that the subject under consideration by the law-making body was the relationship of principal and agent as it exists when a person is *licensed as an insurance agent*. There is no such entity as "an insurance agent" as that term is applied to the professions. Each insurance agent must be the agent of some specific company and that was, of course, the understanding of the Legislature. When the law deals with the relationship between one agent and another agent, it necessarily means that such agents both represent the insurance company involved in the transaction.

As I view the case there are three controlling legal factors. These three factors will be discussed in answer to the following questions:

(1) Did the contract between Morgan Insurance Company, Inc., hereinafter referred to as Morgan, and Eton Insurance Agency, a partnership, hereinafter referred to as Eton, and the receipt by Eton of the commissions on insurance written by Morgan constitute a violation of the Insurance Statutes of Arkansas?

(2) Are the defendants in a position to raise the defense of the doctrine of "in pari delicto" without having set up such plea in their answer?

(3) Does the doctrine of "in pari delicto" prevent a recovery on the part of the plaintiff?

I.

The answer to the first question is in the affirmative. The discussion of this matter in the preceding portion of this opinion is, I think, sufficient to show the violation of the Insurance Statutes. By way of explanation of my conclusions and for emphasis, I shall further examine the matter briefly.

In the first place, the relationship between W. S. Morgan, Jr., Manager, President, Owner, and *alter ego* of

Morgan, and Toney, one of the two partners and manager of Eton, constituted a sort of unholy alliance resulting in the giving away of Morgan's commissions in the face of the statutes prohibiting such action. All of Morgan's insurance commissions were delivered as soon as they were received, or shortly thereafter, to Eton. An insurance commission is a sum of money that is paid directly to the company's agent, though it is actually deducted by the agent from the trust fund in his hands.[1] The insurer in such a case is entitled to have the money represented by the commissions remain in the hands of its agent and not fall into the hands of anyone with whom there is no affiliation and whom it cannot call to account for failure to give its business proper representation and to guard its interests at all times. The statutes forbidding the diversion of commissions would completely lose their effectiveness and be stripped of their purpose if they should be so construed as to except agents of other companies or so-called brokers. This principle was the original legislative concept of the relationship between an insurance agent and his company and is carried throughout all the statutes on the subject. Under the Act of 1949 providing for the examination of persons desiring to act as insurance agents, only qualifying certificates are issued by the commissioner to those who pass the examination. No one becomes an agent or "licensed agent" unless and until he is appointed as an agent of some particular insurance company authorized, of course, to do business in Arkansas. If the appointment by the company is approved, a license is issued and sent, not to the agent himself, but to the company that makes the appointment. The agent is thereby licensed—not to write insurance generally, but to write insurance for the company by whom he has been appointed. Upon the issuance of the license, the agent can,

as such, enter into insurance contracts on behalf of his principal. His acts are the acts of his principal. Through him the principal issues the insurance policies, collects the premiums and pays the commissions. The agent himself has no individual responsibility to the insured so long as he occupies properly and faithfully his position as agent. He cannot obligate his principal to pay someone else a commission and he cannot himself prostitute his own business by diverting his own commissions, except to one who is in a similar position with respect to his principal, that is, another agent for the same company. I think this is a correct statement of the rationale of the law as it is and as it should be.

But, say the defendants, Eton was a "broker" and the gobbling of the commissions was the payment of a "brokerage". The way these shibboleths have been seized upon by some venturesome agents to get into forbidden fields and profit by illegal transactions constitutes an interesting chapter in contemporary history of insurance in this state. There is no law providing for the creation, licensing or regulation of an insurance broker, nor is there any law for the payment of a so-called brokerage by an agent in this state to another insurance agent operating in this state. However, many other states have now and for several years have had provisions of law for licensing and regulating insurance brokers, for example, California and New York, as well as one or more states adjoining this one. Operations under these laws eventually brought about the enactment of a statute of this state providing for the licensing of non-resident insurance brokers and for the division of commissions with agents in this state on a reciprocal basis, Act 175 of the Acts of 1943, §§ 66–308, 66–316, Ark.Stat.1947. Then, too, the word "broker" has occasionally slipped into Arkansas Statutes introduced as uniform laws, copied from

1. Morgan v. American Fidelity Fire Insurance Co., 8 Cir., 210 F.2d 53. This court held that premiums collected by Morgan were in a fiduciary capacity as trustee for the company and the debt created by his personal use of the funds so collected was not dischargeable in bankruptcy.

the laws of other states which have legally qualified and acting brokers—for example, Act 303 of the Acts of 1949, Ark. Stat.1947, § 66–1701 et seq. and Act 232 of the Acts of 1947, Ark.Stat.1947, § 66–326. As used in these Acts, the term "broker" is, of course, meaningless. It is doubtful that the appearance of the term in those statutes has confused or misled anyone. But this cannot be said of the statute governing non-resident insurance brokers and the business that has greatly increased since the passage of the statute permitting the licensing of non-resident insurance brokers. In connection with the business and under the reciprocal provisions of the statutes considerable enjoyment has been had by the division of commissions collected by these non-resident brokers. When some agents in this state tasted these lozenges as brokerage commissions, they liked them very much. As a result there have arisen many temptations to effect "brokerage" deals—not for licensed non-resident brokers, but for others and in violation of our statutes. It may be that there have been no prosecutions for these violations, and it may be that none of the agents have been called to account for commissions so illegally received. Perhaps, in most cases in which this practice has been used the circumstances under which it has occurred were such that it resulted in absolutely fair dealings. That probably points to the need for so amending the statutes that it should be made legal under proper supervision of the Insurance Department.

Considerable reliance for validating the transaction between Morgan and Eton is put upon § 66–326, Ark.Stat.1947, § 1, Act 232 of 1947. An objective analysis of this section of the statute fails to justify any such reliance. The first sentence of the statute contains numerous prohibitions, among which are these: 1, the payment of any rebate; 2, the allowance of any discount or abatement; 3, the *giving* of any credit or reduction of the premiums, or any special favor or advantage in the dividends or other benefits to accrue thereon, or any *valuable consideration* or *inducement* whatever not specified in the policy of insurance, etc. The second sentence prohibits any insured, or *employee of such insured,* from receiving or accepting any such rebate, discount, abatement, credit or reduction of premium, or any such special favor or advantage or *valuable consideration* or *inducement.* Morgan's *gift* to Eton each time a collection of premiums was made surely violated the third category of prohibitions in the law. The prohibitions in the second sentence were violated in the spirit, if not in the words thereof, for the Dutch O'Neal Company was, in effect, the insured in each policy issued, because it held the legal title to the property insured. Mr. Toney was an employee of Dutch O'Neal Co., as was also Mr. O'Neal, and each of them received the prohibited "valuable consideration or inducement". The last sentence in the paragraph does not serve to relieve the violators, for it merely explains that the section shall not be construed as prohibiting *"the payment* of commissions or other compensation". The money received from Morgan by Eton was not a *payment.* It was a gift. It was not commissions, for commissions are the deductions made by an agent from collections of premiums by him. Eton could not claim that a payment was due it for commissions or other compensation. The last sentence was designed to preserve the proper relationship between insurers and their agents, and not to legalize any of the acts prohibited and penalized by the law. Neither were the transactions *sharings of commissions.* The prohibitions contained in this Act may have been in the mind of counsel when Morgan was repeatedly led into testifying that he was giving Eton "brokerages", or this may have been prompted by the realization that the transactions did not, in fact, constitute the sharing of commissions and that Morgan's testimony that "we wrote insurance for him (Toney) rebating him" condemned the transactions as flagrantly illegal. The court should not countenance the means resorted to by Morgan and Eton to evade

the plain provisions of this statute. It was a sort of subterfuge that I feel sure is not indulged in by well regulated insurers and their agents.

■ In connection with the foregoing comment I must point out that there is nothing in the record in this case to establish that the Insurance Commissioner of Arkansas has interpreted the law to mean that any insurance agent of one company is duly authorized to broker insurance through the agent of another company and receive the commissions thereon. Such an interpretation would make a mockery of the whole framework of the law governing insurance companies and their agents. Mrs. Craig, a witness in this case who is supervisor of the License Division of the State Insurance Department, did not presume to speak for the State Insurance Commissioner. She said only that she knew that agents not representing the same companies did divide insurance commissions. She did not say she knew of an instance where one agent gave all his commissions to another. She did not say that such a practice met with the approval of the Commissioner. Moreover, if she had testified that such practice met with the approval of the Insurance Commissioner, such approval would not change the law; neither would the desires and practices of some agents or of all agents, with or without administrative tolerance or sanction, change the law. It should be stated that counsel for the defendants did not contend that the practice or custom could establish the law.[2]

## II.

It was suggested that the case of Lopez v. United States Fidelity & Guaranty Co., reported in D.C., 18 F.R.D. 59, 61, was controlling and that the plea of "in pari delicto" came in too late, because it was not set up in the answer and time for the plea had expired. It is true that the court in that case said, referring to the Federal Rules of Civil Procedure, that:

"* * * These rules require that defenses to a claim, as well as a claim for relief, shall be stated in short and plain terms, and each averment shall be simple, concise and direct, although no technical forms are required; and that any matter constituting an avoidance or affirmative defense must be affirmatively pleaded. The purpose of such rules is to prevent surprise. Failure to plead an affirmative defense results in the waiver of that defense and it is excluded as an issue in the case."

If the rule, as there stated by the court, is to be applied in all cases, it would unquestionably preclude the defendants in this case from raising that defense. However, Fed.Rule Civ.Proc. Rule 12(h), 28 U.S.C.A. provides that:

"The defense of failure to state a claim upon which relief can be granted * * * may also be made * * * at the trial on the merits".

■ While the oral motion made at the trial on the merits was improperly designated as a motion for summary judgment, which should comply with the

---

2. Mrs. Craig testified as follows:

"By Mr. Panich: * * *

"Q. Do you have any records showing that the American Fidelity Fire Insurance Company ever at any time requested a license for Mr. George Toney? A. No, I do not.

"Q. Do you have any record which would reflect whether or not Eton Insurance Agency, as such, was granted a license? A. We never license agencies.

*   *   *   *   *

"By Mr. Thurman: * * *

"Q. Was he licensed by Southwest

Fire & Casualty from November 16, 1951 to June 15, 1953? A. Yes, sir.

*   *   *   *   *

"Q. And the license which Mr. Toney had enabled him to engage in that brokerage business? A. Yes.

"Mr. Panich: I object to that last question, Your Honor please—

"Mr. Pope: That's a question of law.

"Mr. Panich (Continuing): That's a question of law to be decided by this court.

"Mr. Thurman: I put that in, Your Honor, solely for the purpose of showing custom in the community, not to try to establish the law."

provisions of Rule 56, and while the objections to the motion were sustained by the court for noncompliance with the rule, it now seems clear that the motion does fall in the category as stated in Rule 12(h), of a permissible motion at the trial on the merits.

The quoted portion of Rule 12(h) is the simplification of and continuation of a rule established by the courts before the effective date of the Federal Rules of Civil Procedure. Probably no better example of the rule can be found than the following excerpt from the subtitle No. 223, "Pleading Illegality" under the title "Contracts", 12 Am.Jur. 742:

> "Where the matter showing the illegality of an agreement appears on the face of the pleading counting on it, its illegality is a question to be dealt with by the trial court without a formal plea of facts showing its illegality. If a plaintiff, in order to make out his cause of action, is required to show that the agreement sued upon is, for any reason, illegal, the court should not enforce it, regardless of whether the illegality has been pleaded. But there is authority to the effect that when the illegality does not appear from the agreement itself or from the evidence necessary to prove it, but depends upon extraneous facts, the defense is new matter and must be pleaded in order to be available. And, since illegality is not presumed where the facts necessary to entitle a party to relief are stated, if illegality exists, it should be pleaded as a defense. However, it is generally held that even though the defendant does not set up the defense of the illegality of the agreement sued on, but such illegality appears from the case as made by either the plaintiff or the defendant, it becomes the duty of the court sua sponte to refuse to entertain the action. It has been said that courts will take notice of their own motion of illegal agreements which come before them for adjudication and will leave the parties where they have placed themselves."

### III.

The answer to the third question has called for a great deal of study, and though I have no doubt as to the correctness of my conclusion in the matter, reached after carefully examining, not only the authorities cited by counsel but many others, I feel that I should discuss the matter at some length, because counsel for both parties appear to be earnest in their contentions, each side feeling that it is unquestionably on sound ground. Since I have held that the transactions between Morgan and Toney were illegal and that the question is now properly before the court, it is now for me to determine whether the principle commonly referred to as "in pari delicto" is applicable, and, if so, whether it prevents a recovery on behalf of the plaintiff. The rule as generally stated is that no court will allow itself to be used in aid of any of the parties to an illegal agreement. This rule applies to any agreement which is illegal, immoral, against public law, or is forbidden by statute. 17 C.J.S., Contracts, § 272, pp. 656–659. 12 Am.Jur., Contracts, § 209 and § 210. Neece v. Joseph, 95 Ark. 552, 129 S.W. 797, 30 L.R.A.,N.S., 278. Security Mutual Liability Insurance Co. v. Little, 119 Ark. 498, 178 S.W. 418, L.R.A.1917A, 475.

There are no disputed questions of fact in this case and it has not been necessary for the court to resolve any factual issues. There was little, if any, conflict in the testimony of Morgan and Toney as to the details of the transactions; however, these witnesses did not always use the same terms in describing the operations resulting in the receipt by Eton of the money in controversy. Morgan described the operation as, "I was brokering insurance from them (Eton)", and "We wrote insurance for him (Toney) rebating him". He then testified, doubtless using the wrong name, "We signed the contract to pay Dutch O'Neal a twenty-five percent commission". A question and answer throws considerable light

on the nature of the business Morgan carried on with Dutch O'Neal (Eton):

"Q. Dutch O'Neal was collecting those premiums when he made a sale of the automobile and he later remitted the full amount to you?

"A. And I gave him a check for each item of twenty-five percent."

And then this question:

"Q. You were not paying Dutch O'Neal the same twenty-five percent that the American Plan was paying you?

"A. No, we were paying him considerably more."

Morgan was also asked this question:

"Q. Now, I will ask you what is your understanding of the definition of that word 'rebate'?

"A. Well, the word, 'rebate' was used in lieu of commission, and I think I changed it in some other answers to commission."

He was further asked if he ever rebated any sums of money to the original policyholder and he answered in the negative. Then, Morgan was asked this question:

"Q. About 1952 or 1953, is it not true that you contacted Mr. Toney and solicited this brokerage business from him?

"A. Yes, sir."

And then this question:

"Q. And that brokerage arrangement was one which you solicited from Mr. Toney and Mr. Toney accepted and that is under that arrangement that Eton Isurance Agency did business with the Morgan Insurance Agency?

"A. That's right."

There was considerable other testimony on the part of Morgan, all of which centered principally around the terminology of the transactions. There is no dispute, however, as to what actually happened. Morgan gave to Toney or Eton an amount of money equalling the commissions which were due Morgan by the American Fidelity Fire and Casualty Company.

I have set out the foregoing excerpts from the testimony of Morgan to show the extent of his participation in what I have decided were illegal transactions. As I view the matter, they fall clearly within the category of acts that have been declared illegal to the extent that the court cannot entertain an action to recover monies paid by one of the two participants therein. The case of Equitable Life Assurance Society v. Wetherill, 3 Cir., 127 F. 947, 949, is in point. In that case Edward A. Reilly of the firm of Reilly & Sherman received an application for an insurance policy of $100,000, and, as an inducement for the application, the insurance agents paid the first premium. Suit was later filed to recover from the insured the amount paid. This transaction violated a statute of the State of Pennsylvania prohibiting any payment or allowance, either directly or indirectly, of "any inducements to insurance, any rebate of premium paid on the policy". A violation of this statute was made punishable by a fine. The court, in passing on the question of whether or not a suit could be maintained to recover, said:

"It is claimed by the plaintiff in error, that the contract testified to by Wetherill was in violation of this enactment, and therefore illegal and void. It is sufficient answer to this point to say that the law does not help those, who have made an illegal contract, to recover back the money paid in pursuance thereof, but leaves them where it finds them. The contract was executed. Wetherill was induced to take out the policy and assume responsibility for subsequent premiums, by the undertaking of Reilly & Sherman to pay the first year's premium, which was payable in advance, as a condition precedent to the issuance of the policy. It appears by the testimony adduced by the use plaintiff (sic), that this advance premium was paid by Reilly & Sherman to the Equitable Society,

and that its policy was thereupon issued and delivered, through Reilly & Sherman, to Wetherill. The contract, therefore, was entirely executed. The company had received the premium due to it, and had, as was testified to by plaintiff's own witnesses, no claim against Wetherill. 'Where money has been paid upon an illegal contract, it is a general rule that if the contract be executed, and both parties are in pari delicto, neither of them can recover from the other the money so paid.' Spring Co. v. Knowlton, 103 U.S. 49, 58, 26 L.Ed. 347; Pollock on Contracts, star p. 332; Leake on Contracts, 774."

A decision of the Circuit Court of Appeals of the 8th Circuit, Levy v. Kansas City, Kansas, 168 F. 524, 525, 22 L.R.A., N.S., 862, wherein the opinion was written by Circuit Judge Sanborn, is so forceful in its application of the rule of law involved in this case that I think it well to quote to some extent therefrom. In that case a suit was brought to recover the sum of $5,000 that had been paid to the City of Kansas City, Kansas, for the right to carry on a business in that city which was in violation of the laws of the State of Kansas. The city had accepted the money in compliance with an ordinance which the city itself had passed permitting such business to be carried on. In dealing with the question the court said:

" 'Ex dolo malo non oritur actio' is a maxim which lies at the foundation of a general rule of public policy, the rule that the courts will not sustain an action which arises out of the moral turpitude of the plaintiff or out of his violation of a general law enacted to carry into effect the public policy of the state or nation. [Citing ten opinions of the Supreme Court of the United States]. But counsel say, and it is true, that this is not an action to enforce the illegal contract evidenced by the license, but to recover back the money he paid for this contract

that the city repudiated, this contract for which he received no consideration. But the maintenance of actions to recover moneys or property lost, or damages sustained, through transactions or contracts wherein the plaintiffs were guilty of moral turpitude, or of the violation of a general law passed to effectuate a public policy, is prohibited by this rule, as well as the maintenance of actions upon contracts of that nature. [Citing two cases from the Supreme Court of the United States and fifteen cases from the Supreme Courts of the various states.]

"The complaint shows that the city had enacted an ordinance which by its terms authorized the plaintiff to carry on for a year his business of book making and pool selling, that other persons were conducting a business of that nature under that ordinance with the consent of the city, and that the city received the plaintiff's money and issued a license to him; and counsel argue that the plaintiff was deluded into parting with his money by the acts of the city, by its ordinance, by its practice of issuing licenses and of permitting other licensees to carry on a similar business thereunder, and by its acceptance of his money and its issue of the license to him. It is conceded that the action of the city in taking his money for a license to do business for a year under its ordinance, in depriving him of the use of this license two days later, and in refusing to return his money to him, is abhorrent to the sense of fairness and justice and despicable. Nevertheless, one who loses his money or his property by knowingly engaging in a contract or transaction which involves his own moral turpitude, or his violation of a general law enacted to carry into effect a public policy, may not maintain an action for his loss or his damages because the acts of others deluded or persuaded him to be-

lieve that they would continue to violate the law or to perform an illegal contract, and this because his own moral turpitude and his violation of the law repel him from the courts."

The opinion last cited is impressive on this court for two reasons. First, the writer of the opinion was one of the most brilliant and profound lawyers who ever occupied a seat on the 8th Circuit Court of Appeals; and second, he was the writer of the dissenting opinion in a case involving the same principle of law which I shall later discuss in this memorandum.

The subject is discussed in an opinion by Judge Denman of the 9th Circuit, Danebo Lumber Co., Inc., v. Koutsky-Brenna-Vanna Co., 182 F.2d 489, 493. The court there reversed the District Court for the District of Oregon which had permitted a buyer of lumber to rescind his contract and recover money paid thereon where the contract was in violation of the Emergency Price Control Act of Congress. The court there said:

"The law is stated in an opinion of Mr. Justice Stone in Second Russian Ins. Co. v. Miller, 268 U.S. 552, 562, 45 S.Ct. 593, 597, 69 L.Ed. 1088, to be, 'By our own law payments made under contracts which are illegal where the parties are *in pari delicto* may not ordinarily be recovered. The law leaves the parties where it finds them and gives no relief. [Citing cases.]"

The court there quoted from two opinions from the 8th Circuit Court of Appeals, one being from Judge Sanborn's opinion above referred to, and the other quotation is as follows:

"Similarly in Marshall v. Lovell, 19 F.2d 751, 755, the Eighth Circuit Court of Appeals held that 'The fact that the action is one to recover back money paid under an illegal contract and not an action to enforce the contract makes no difference.' Also in Farrington v. Stucky, 8 Cir., 165 F. 325, where the wrongful agreement was not at any time to build a station between two others, the circuit court of appeals refused to rescind and restore a bonus paid for the agreement, although the illegal agreement was still executory."

In the last opinion from which quotations have been made, it appears that it had been urged upon the court that the parties were not "in part delicto". The court rejected these contentions and pointed out that the decisions relied upon were clearly distinguishable, as they are and would be distinguishable from the undisputed facts in the case now before the court.

Counsel for plaintiff cited the case of Stewart v. Wright, 8 Cir., 147 F. 321, 329, certiorari denied, 203 U.S. 590, 27 S.Ct. 777, 51 L.Ed. 330, in which it was held that the defense of "in pari delicto" was not available to the defendants to prevent the recovery of money defendants had obtained from plaintiff by means of a confidence game. Both the majority opinion written by Judge Hook and the dissenting opinion written by Judge Sanborn are learned and exhaustive. The majority of the court there held that although the money lost by the victim was the result of his participation in illegal acts, he was nevertheless without fault because he had been misled by swindlers and confidence men masquerading as wealthy miners and business men to engage in betting on foot races, the results of which were always secretly prearranged. The majority opinion cites and discusses a great many authorities, and the epitome thereof is found in the following quotation from the majority opinion:

"These conclusions are abundantly supported by authority. The rule which declares that when parties are in equal wrong the position of the defendant is the better, and that the courts will not allow their machinery to be used for the relief of one who has been defrauded in a corrupt or illegal transaction in which he participated, is based not upon statutory provisions, but upon general principles of public policy. It is therefore not for the sake of the de-

fendant that the rule is enforced, but to promote the general good. And when the objection is urged by the defendant, or is suggested by the court of its own motion, two questions present themselves for consideration: Were the parties in equal wrong, or was there such fraud, deceit, oppression, or inequality as challenges the attention of a court of justice? If they appear to be in equal wrong, will nevertheless a wise regard for the general welfare be better subserved by the punishment of the defendant than by denial of relief to the complaining party? In 1 Story, Eq.Jur. § 300, it is said:

" 'And indeed in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto, for there may be, and often are, very different degrees in their guilt. One party may act under circumstances of oppression, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in the offense. And, besides, there may be on the part of the court itself a necessity of supporting the public interests or public policy in many cases, however reprehensible the acts of the parties may be.' "

I think that it need not be said that there is no similarity of facts between the Stewart case and the case now before the court. It is interesting to note that Judge Sanborn wrote a very forceful dissenting opinion. A reading of the dissenting opinion serves to point up very strongly the dissimilarity between that case and the instant one.

Counsel for plaintiff also cited the case of Union Electric Co. of Missouri v. Boehm, D.C., 92 F.Supp. 177. In that case the Union Electric Company, a corporation, and the Union Electric Power Company sought an accounting for the misappropriation of corporate funds by defendant as former corporate officers. These two plaintiff companies were substituted corporations for Mississippi River Power Company and Union Electric Company of Illinois, whose corporate officers had misappropriated funds. The plaintiffs in the case were seeking to recover for the benefit of the stockholders money that had been taken from the corporate funds by various nefarious schemes initiated by the defendants. The corporate funds involved in that suit had been withdrawn by the defendants personally but while acting as employees of the corporations. The defendants claimed that the corporations were, therefore, without clean hands and were "in pari delicto" with the defendants. Among other things it was claimed by the defendants that the illegal disposition of the funds, in part, was the act of the corporate defendant in making campaign contributions in violation of the provisions of the Public Utility Holding Act, 15 U.S.C.A. § 79 et seq. The court there held that a corporation has no power to ratify acts which are illegal and immoral in the eyes of the law and that the mere fact that a corporation has been held liable criminally for acts of its agents does not settle accounts as between the principal and the agent, nor does such a thing convict the corporation of unclean hands in its suit against its officers. The court then quoted from the case of Francis Oil & Refining Co. v. Manville & Co., Inc., 2 Cir., 296 F. 349, 352, as follows:

"Indeed, where the wrong goes beyond the parties themselves, and particularly where the plaintiff seeking recovery is in some relation to others whereby his participation in the wrong injures them, the courts reach below the surface in the desire to protect the injured. Wetmore v. Porter, 92 N.Y. 76; 21 C.J. 189; Saylor v. Crooker, 97 Kan. 624, 156 P. 737, Ann.Cas.1918D, 473."

The court may not have clearly understood the position of counsel for plaintiff, but it seems that he was of the view that the language quoted from 2 Cir., 296 F. 349 fits into the provisions of 11 U.S.C.A. § 110(e) (1). It was cor-

rectly argued that this provision of the Bankruptcy Act does lodge in the Trustee in Bankruptcy powers that were not those of the bankrupt himself; in other words, that the Trustee does more than "stand in the shoes of the bankrupt". This power, however, of the Trustee is limited to the express terms of the statute and such power is expressed in § 110 (e) (1), as follows:

"A transfer made or suffered * * by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor."

It is seen that before the Trustee can assert that thereby he has a right to maintain an action to recover money transferred, it must appear that the transfer was voidable under a state or a federal law, or for any other reason, *by a creditor of the debtor.*

It is true that in this case payment of the monies by Morgan to Eton was in violation of the law, and, but for the doctrine of "in pari delicto", they could be recovered by Morgan, but this does not give the creditors any rights whatsoever. If the wrongful disposition of commissions that would have otherwise gone into the treasury of Morgan Insurance Company had vested the creditors with the right of reclamation, this statute would apply, but I do not understand that it can be contended that the transfer of these monies by Morgan to Eton had any such effect.

At one time it was suggested in a brief by counsel for plaintiff that payment of these monies was fraudulent under the provisions of § 68–1302 and § 68–1304, Ark.Stat.1947. This position has been properly abandoned. Therefore, I am unable to find that said § 110(e) (1) serves to take the Trustee out of the shoes of the bankrupt, but he is incumbered with the same impediments the bankrupt would have if it were now before the court seeking to recover the illegal payments to Toney and O'Neal.

Briefly summarizing, I find that I must hold that while the transactions involved were in violation of the Statutes of Arkansas, both § 66–321 and § 66–326 of Ark.Stat.1947, and penalized by the provisions of the latter section, I cannot possibly find that Morgan's participation in these illegal acts was accompanied by any extenuating circumstances or conditions. It unquestionably was "in pari delicto" and this serves to defeat the claim of the Trustee for the recovery of the monies paid by Morgan to Eton.

I am, therefore, entering a judgment dismissing the plaintiff's complaint at his costs.

